ROBERT BARNETT *v.* BOARD OF EDUCATION OF THE TOWN OF FAIRFIELD
(14987)

CALLAHAN, NORCOTT, PALMER, F. X. HENNESSY and M. HENNESSEY, Js.

---

Argued November 29, 1994—decision released February 14, 1995

*Vito Mazza*, for the appellant (plaintiff).

*Christopher M. Hodgson*, for the appellee (defendant).

CALLAHAN, J. The principal issue in this appeal is whether the defendant, the Fairfield board of education (board), properly terminated the employment of the plaintiff, Robert Barnett. The plaintiff had been employed by the board as an industrial arts teacher for twenty years. He had attained tenure, pursuant to General Statutes § 10-151 (a) (6) (A), because he had completed "thirty school months of full-time continuous employment for the same board of education. . . ." The plaintiff's employment was terminated by the board on September 25, 1992, as a result of a reduction in force in his department. The plaintiff appealed from the board's decision to terminate his employment to the Superior Court, which rendered judgment dismissing his appeal. He appealed from that judgment to the Appellate Court and we transferred his appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c). We affirm the judgment of the trial court.

The board had a collective bargaining agreement with the plaintiff's bargaining unit, the Fairfield Education Association (union), in effect from July, 1990, through June, 1993. Article V of the agreement set forth the procedure for layoffs due to a reduction in force. Section 5.1.1 provided in pertinent part: "Where there are more individuals within a category than necessary to reduce, least senior teachers shall be terminated before more senior teachers, provided that those teachers remaining are the most qualified to perform the work available after the reduction . . . ." In 1990, all of the teachers in the plaintiff's department had the same seniority status.[1] Section 5.1.2 of the agreement pro-

[1] Section 5.1 of the collective bargaining agreement set forth five categories, labeled A through E, into which teachers were placed based on seniority. In 1990, the plaintiff and all of the teachers in his department were in category D, defined as: "Tenured teachers with professional Certification with ten or more years of contractual service in the Fairfield Public Schools."

vided for a point system to be used to determine the most qualified teachers.[2] According to § 5.1.2.7 of the agreement, the points assigned to a teacher initially would remain valid for a three year period, unless the teacher or his immediate supervisor requested an update of the teacher's job description analysis, or anecdotal report, to include new information.

On April 7, 1990, the plaintiff received a letter from Ralph Burke, the personnel administrator for the Fairfield public schools, indicating that the industrial arts department would be subject to a reduction in force. The letter further indicated that each member of the department would be evaluated pursuant to the provisions of §§ 5.1.1 and 5.1.2 of the collective bargaining agreement. In response to the letter, the plaintiff's immediate supervisor at the time, R. J. Margucci, prepared an anecdotal report and submitted it to the interim superintendent of schools, William French. On that evaluation, the plaintiff received a point assignment of eighty-one, giving him the number one ranking out of the seven members of the industrial arts department. On the basis of the evaluation, the plaintiff was not subject to dismissal at that time.

On March 15, 1991, the plaintiff received another letter from Burke indicating that his department would be subject to another force reduction. The letter stated in part: "Within the last three years you and your supervisor authored an anecdotal report which was later read by the Superintendent. Normally, unless you or your supervisor requested an update for new information, the points assigned would remain valid. As a result of a recent grievance settlement—the [union] and

---

[2] Section 5.1.2.5 of the collective bargaining agreement provided, inter alia, that the teacher's "immediate supervisor will complete a Job Description Analysis . . . [and] will assess the teacher's qualifications by writing comments for each of the five items in the job description." The job description analysis also is referred to as an "anecdotal report."

Administration has agreed that [the superintendent of schools, Carol Harrington,] will re-evaluate *all* anecdotal write-ups and reassign points for those within Category D of the Industrial Arts Department." (Emphasis in original.) The grievance referred to in the letter was that of Ronald Salamon, who also was a teacher in the department. Salamon, through the union, had filed a grievance claiming that his anecdotal report was not as complete as it should have been because of the absence of one of his supervisors. The grievance was settled between the union and the board by an agreement under which the superintendent of schools would order all of the anecdotal reports to be redone for that department. In response to the 1991 letter from Burke, the plaintiff chose not to have his report updated, and submitted the same report that he had submitted in 1990. The plaintiff thereafter received a new point assignment of sixty-one, which resulted in a ranking of sixth out of the eight teachers in the department. He subsequently received notification that he would not be subject to termination at that time.

The plaintiff filed a grievance through the union disputing the reassignment of points in 1991. The grievance was denied by the board at step four of the grievance procedure provided by the collective bargaining agreement. The union refused to pursue the matter to arbitration and the plaintiff did not pursue an action against the union for its refusal to pursue his grievance to arbitration.

In April, 1992, the plaintiff received a third letter from Burke, which notified him that his department again was subject to a potential reduction in force.[3] This letter stated in part: "Within the last three years you

---

[3] The language of this letter and the letter dated March 15, 1991, are virtually identical, with the exception of the language in the 1991 letter quoted above, which specifically refers to the grievance settlement. The plaintiff referred to the letter as a "form letter."

and your supervisor authored an anecdotal report which was later read by the Superintendent. *Unless you or your supervisor request an update for new information, the points assigned will remain valid."* (Emphasis added.) In response, the plaintiff's immediate supervisor, Margaret Mary Fitzgerald, submitted an updated anecdotal report concerning the plaintiff. The plaintiff testified that Fitzgerald encouraged him to submit an updated report, and although he did not believe that the superintendent could reassign points at that time, he told her to submit an updated report if she thought it possibly could help him. On the advice of his attorney, however, he did not sign the report. The plaintiff continued to maintain that his original evaluation resulting in an assignment of eighty-one points should have remained in effect for a period of three years. Burke testified, however, that the plaintiff's immediate supervisor requested an update of the plaintiff's anecdotal report for new information in 1992. The superintendent evaluated the plaintiff's updated anecdotal report, and again the plaintiff received a point assignment of sixty-one. As a result, the plaintiff was ranked last among the teachers in his department.

The plaintiff later received a letter, dated June 17, 1992, indicating that he was under consideration for termination due to the elimination of the position to which he had been appointed. See General Statutes § 10-151 (d) (5).[4] The plaintiff requested a hearing

---

[4] General Statutes § 10-151 (d) provides in relevant part: "The contract of employment of a teacher who has attained tenure shall be continued from school year to school year, except that it may be terminated at any time for one or more of the following reasons . . . (5) elimination of the position to which the teacher was appointed . . . . Prior to terminating a contract, a board of education shall vote to give the teacher concerned a written notice that termination of such teacher's contract is under consideration and, upon written request filed by such teacher with such board within seven days after receipt of such notice, shall within the next succeeding seven days give such teacher a statement in writing of the reasons therefor. Within

before an impartial panel pursuant to § 10-151 (d). The panel of arbitrators held a hearing on August 19, 1992, and issued its findings on September 16, 1992. The three panel members agreed upon findings numbers one through ten and finding number thirteen, but one member disagreed as to findings numbers eleven and twelve. The majority's finding number eleven stated: "Sec. 5.1.2.7 of the Collective Bargaining Agreement was not revoked by the settlement of the Ronald Salamon grievance and remains in effect until the Union Membership ratifies a change or until a new contract is signed." The majority's finding number twelve stated: "Neither Mr. Barnett [nor] his immediate supervisor directly requested a reevaluation or reassignment of points in 1991 or 1992. Any reevaluation or reassignment of points in those years was made at the suggestion of the Superintendent of Schools, not the grievant's immediate supervisor." Based in part on these findings, the two member majority recommended that the plaintiff be reinstated, concluding that the plaintiff had the right to rely on the results of the 1990 assignment of eighty-one points.

The dissenting arbitrator recommended that the board terminate the plaintiff's employment contract. To support his conclusion, the dissenting arbitrator proposed the following findings: "11. The effect of the grievance settlement on the Robert Salamon case did impact the 1991 re-evaluation and reassignment of all teachers within Category D of the Industrial Arts Department including Mr. Barnett. In order to be in compliance with the grievance settlement, the admin-

twenty days after receipt of written notice by the board of education that contract termination is under consideration, such teacher may file with such board a written request for a hearing. A board of education may designate a subcommittee of three or more board members to conduct hearings and submit written findings and recommendations to the board for final disposition in the case of teachers whose contracts are terminated for the reasons stated in subdivision (5) of this subsection. . . ."

istration was obligated to include all Industrial Arts teachers within Category D in the re-evaluation and reassignment of points. 12. Mr. Barnett's immediate supervisor, Margaret Mary Fitzgerald, requested and prepared an updated Job Description Anecdotal Report in 1992, and encouraged Mr. Barnett to participate in the updated report. The Superintendent of Schools, Dr. Carol Harrington, made the final decision on the re-evaluation and reassignment of points in 1991 and 1992."

The board held a public hearing on September 24, 1992, to consider the termination of the plaintiff's contract. The plaintiff was notified by letter, dated September 25, 1992, that the board had voted to terminate his employment. The letter stated: "The reason is that the [board] found the dissenting findings number 11 and 12 correct and therefore accepted the Superintendent's recommendation which was predicated on the elimination of the position to which you had been appointed."

The plaintiff appealed the board's decision to the trial court, pursuant to General Statutes § 10-151 (f).[5] The court dismissed the appeal, finding that the board properly had adopted the dissenting arbitrator's findings numbers eleven and twelve and properly had terminated the plaintiff's employment. The plaintiff raises

---

[5] General Statutes § 10-151 (f) provides in relevant part: "Any teacher aggrieved by the decision of a board of education after a hearing as provided in subsection (d) of this section may appeal therefrom, within thirty days of such decision, to the superior court. . . . The court, upon such appeal, shall review the proceedings of such hearing and shall allow any party to such appeal to introduce evidence in addition to the contents of such transcript, if it appears to the court that additional testimony is necessary for the equitable disposition of the appeal. The court, upon such appeal and after a hearing thereon, may affirm or reverse the decision appealed from. Costs shall not be allowed against the board of education unless it appears to the court that it acted with gross negligence or in bad faith or with malice in making the decision appealed from. . . ."

two issues on appeal: first, whether the trial court correctly concluded that the board had acted properly in adopting the dissenting arbitrator's findings numbers eleven and twelve;[6] and second, whether the board adequately had apprised the plaintiff of the reason and factual basis for the termination of his employment. We affirm the judgment of the trial court.

I

"When considering termination of a tenured teacher's employment contract, a school board 'acts, like an administrative agency, in a quasi-judicial capacity . . . .' *Mauriello* v. *Board of Education*, 176 Conn. 466, 469, 408 A.2d 247 (1979); *Miller* v. *Board of Education*, 166 Conn. 189, 191, 348 A.2d 584 (1974)." *Tomlinson* v. *Board of Education*, 226 Conn. 704, 712, 629 A.2d 333 (1993). "Our function in reviewing the action of the board pursuant to § 10-151 (f) is to determine whether the board has acted illegally and not to substitute our judgment for that of the board. . . . A school board 'has discretion to accept or reject a recommendation from an impartial hearing panel,' though it is bound by the panel's findings of fact unless unsupported by the evidence." (Citations omitted.) *Rado* v. *Board of Education*, 216 Conn. 541, 555, 583 A.2d 102 (1990); *Tomlinson* v. *Board of Education*, supra, 713–14; see *Catino* v. *Board of Education*, 174 Conn. 414, 417–18, 389 A.2d 754 (1978). The board is bound by the panel's findings of fact, "but not by its legal conclusions or by its recommendations." *Petrino* v. *Board of Education*, 179 Conn. 428, 430, 426 A.2d 795 (1980).

Applying these principles to the facts before us, we conclude that the trial court correctly determined that

---

[6] The plaintiff also raises the issue of whether the board acted properly in deviating from the terms of the collective bargaining agreement. Because finding number eleven, of both the majority and the dissent, directly deals with whether the grievance settlement affected the terms of the collective bargaining agreement, this issue is merely a reiteration of the plaintiff's first issue, and we do not address it separately.

the board properly could have adopted the dissenting arbitrator's findings numbers eleven and twelve.

A

In finding number eleven, the majority of the arbitrators found that the settlement reached between the union and the board did not have any effect on the terms of the collective bargaining agreement and consequently did not require a reevaluation of the plaintiff's anecdotal report in 1991. The plaintiff argues that this was a finding of fact that the board was bound to accept. We disagree.

The settlement agreement made between the union and the board stated that every teacher in the department must have his or her anecdotal reports reevaluated in 1991. Although contract interpretation generally is a question of fact; *Gurliacci* v. *Mayer,* 218 Conn. 531, 567, 587 A.2d 1029 (1991); *Finley* v. *Aetna Life & Casualty Co.,* 202 Conn. 190, 199, 520 A.2d 208 (1987); the issue here is not one of contract interpretation; rather, the question is whether the settlement agreement affected the terms of the collective bargaining agreement. The determination of that question is a legal conclusion, and not a finding of fact.

"Judicial review of the conclusions of law reached administratively is . . . limited. The court's ultimate duty is only to decide whether, in light of the evidence, the [board] has acted unreasonably, arbitrarily, illegally, or in abuse of its discretion." (Internal quotation marks omitted.) *Griffin Hospital* v. *Commission on Hospitals & Health Care,* 200 Conn. 489, 496, 512 A.2d 199, appeal dismissed, 479 U.S. 1023, 107 S. Ct. 781, 93 L. Ed. 2d 819 (1986); see also *New Haven* v. *Freedom of Information Commission,* 205 Conn. 767, 774, 535 A.2d 1297 (1988); *Robinson* v. *Unemployment Security Board of Review,* 181 Conn. 1, 5, 434 A.2d 293 (1980). "Conclusions of law reached by the administrative agency

must stand if the court determines that they resulted from a correct application of the law to the facts found and could reasonably and logically flow from such facts." (Internal quotation marks omitted.) *Ottochian* v. *Freedom of Information Commission*, 221 Conn. 393, 397, 604 A.2d 351 (1992); *New Haven* v. *Freedom of Information Commission*, supra, 774; *Griffin Hospital* v. *Commission on Hospitals & Health Care*, supra, 496; *Robinson* v. *Unemployment Security Board of Review*, supra, 5.

The dissenting arbitrator's finding number eleven concluded that "[i]n order to be in compliance with the grievance settlement, the administration was obligated to include all Industrial Arts teachers within Category D in the re-evaluation and reassignment of points." General Statutes § 10-153e (b) (4) prohibits the board from refusing to negotiate in good faith with the union.[7] "The duty to bargain in good faith is a term of art in labor law. It is an ongoing duty that continues after initial contract negotiations are over. . . . If the contract requires arbitration of unresolved grievances, the duty to bargain in good faith includes the duty to participate in good faith in the grievance arbitration process, for dispute resolution under the grievance-arbitration process is as much a part of collective bargaining as the act of negotiating the contract." (Citations omitted; internal quotation marks omitted.) *Board of Education* v. *State Board of Labor Relations*, 217 Conn. 110, 120–21, 584 A.2d 1172 (1991); see also *United Steelworkers of America* v. *Warrior & Gulf Navigation Co.*, 363 U.S. 574, 581, 80 S. Ct. 1347, 4 L. Ed. 2d 1409 (1960) ("[t]he grievance procedure is, in other words, a part of the continuous collective bargaining process").

---

[7] General Statutes § 10-153e (b) provides in relevant part: "The local or regional board of education or its representatives or agents are prohibited from . . . (4) refusing to negotiate in good faith with the employees' bargaining agent or representative . . . ."

The grievance regarding Salamon was brought by the union, the plaintiff's own bargaining representative. The board agreed to comply with the demand of the union "that each member of the Industrial Arts Department have their job description analysis reevaluated and points reassigned." This agreement was part of ongoing negotiations, and both parties had a duty to bargain in good faith during those negotiations. The parties to the collective bargaining agreement mutually agreed to suspend a contractual term for one specific department for a specific period, rather than to alter the terms of the collective bargaining agreement with the school board for the entire union membership.[8]

That the union considered the grievance settlement to be binding under the provisions of the collective bargaining agreement is strengthened by the union's treatment of the plaintiff's grievance after the 1991 reassignment of points. The plaintiff filed a grievance via the union that advanced through step four of the grievance procedures, but did not proceed to the arbitration step because the union refused to represent the plaintiff further.[9] It would be illogical for the union to

---

[8] Article II of the collective bargaining agreement provided a procedure by which the parties could modify the agreement. It stated that "[i]f during the life of this contract, *substantial changes* in the *school organization, instructional practices and/or program structures* should render the language in any part of this contract inappropriate," the parties shall attempt to translate the language of the contract into language appropriate for the new situation. (Emphasis added.) The plaintiff argues that because the procedure set forth in article II was not followed with regard to the grievance settlement, the collective bargaining agreement could not have been modified, and the plaintiff's assignment of points in 1990 would remain valid for three years. The contingencies highlighted in article II, however, were not present. Because the grievance settlement was part of the ongoing collective bargaining process, the parties to the contract were able to agree to suspend the contractual term in one instance without amending the contract.

[9] The plaintiff may have been able to pursue an action against the union for breach of its statutory duty of fair representation in its handling of the

argue, on the one hand, that a job description analysis had to be redone for each member of the department because of the Salamon grievance, and on the other hand, that the plaintiff could not be reevaluated because of the contract language.

The dissenting arbitrator's finding number eleven, therefore, was correct as to the law when it concluded that "[i]n order to be in compliance with the grievance settlement, the administration was obligated to include all Industrial Arts teachers within Category D in the re-evaluation and reassignment of points." This conclusion reasonably and logically flows from the board's obligation to bargain in good faith with the union in the settlement of the Salamon grievance. See *Ottochian* v. *Freedom of Information Commission*, supra, 221 Conn. 397.

Because finding number eleven of the majority of the arbitrators was a conclusion of law rather than a finding of fact, the board was not bound by it. See *Petrino* v. *Board of Education*, supra, 179 Conn. 430. Because the board was obligated to honor the settlement agreement of the Salamon grievance, it did not act "unreasonably, arbitrarily, illegally, or in abuse of its discretion" in finding that the reevaluation of each teacher in the plaintiff's department in 1991 was in compliance with the settlement agreement. *New Haven* v. *Freedom of Information Commission*, supra, 205 Conn. 774. The board, therefore, did not act illegally in adopting the dissenting arbitrator's finding number eleven. *Rado* v. *Board of Education*, supra, 216 Conn. 555.

## B

In finding number twelve, the majority of the arbitrators found that neither the plaintiff nor his immediate

grievance. "If a union fails to submit a meritorious grievance to arbitration, an employee may sue the union for breach of its duty of fair representation." *Tedesco* v. *Stamford*, 222 Conn. 233, 248, 610 A.2d 574 (1992).

supervisor had requested a reevaluation in 1991 or 1992. The dissenting arbitrator's finding number twelve, however, states, to the contrary, that the plaintiff's immediate supervisor did request an update for new information in 1992. Both of these statements are findings of fact. "A school board 'has discretion to accept or reject a recommendation from an impartial hearing panel,' though it is bound by the panel's findings of fact unless unsupported by the evidence." *Rado* v. *Board of Education*, supra, 216 Conn. 555. The evidence to support a finding, however, must be substantial. *Huck* v. *Inland Wetlands & Watercourses Agency*, 203 Conn. 525, 540, 525 A.2d 940 (1987). Our inquiry, therefore, is limited to determining whether the majority's or the dissenting arbitrator's finding number twelve was supported by substantial evidence.

"This so-called substantial evidence rule is similar to the sufficiency of the evidence standard applied in judicial review of jury verdicts, and evidence is sufficient to sustain an agency finding if it affords a substantial basis of fact from which the fact in issue can be reasonably inferred. . . . [I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury. . . . The substantial evidence rule is a compromise between opposing theories of broad or de novo review and restricted review or complete abstention. It is broad enough and capable of sufficient flexibility in its application to enable the reviewing court to correct whatever ascertainable abuses may arise in administrative adjudication. On the other hand, it is review of such breadth as is entirely consistent with effective administration. . . . The United States Supreme Court, in defining substantial evidence in the directed verdict formulation, has said that it is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from

the evidence does not prevent an administrative agency's finding from being supported by substantial evidence. *Consolo* v. *Federal Maritime Commission*, 383 U.S. 607, 620, 86 S. Ct. 1018, 16 L. Ed. 2d 131 (1966) . . . ." (Citations omitted; internal quotation marks omitted.) Id., 541–42.

The plaintiff's employment was subject to termination because of the superintendent's 1992 assignment of points. As previously noted, § 5.1.2.7 of the collective bargaining agreement provided: "Unless the teacher or immediate supervisor requests an update for new information, the points assigned will remain valid for a three-year period." If the plaintiff or his supervisor had requested an update in 1992, then the assignment of points conducted in 1992 was proper, and the plaintiff's employment was subject to termination because he was ranked last among the teachers in his department. Upon review of the record as a whole, we conclude that there was not substantial evidence to support finding number twelve of the majority of the arbitrators and there was substantial evidence to support the dissenting arbitrator's conclusion that the plaintiff's immediate supervisor requested an update for new information. The assignment of sixty-one points that the plaintiff received in 1992, therefore, was valid, and the board did not act illegally when it terminated the plaintiff's employment.[10]

The letter, dated April 20, 1992, that the plaintiff received informing him that his department was subject to a potential reduction in force stated: "Unless

---

[10] Even if we were to agree with the plaintiff, however, that the 1992 point assignment was invalid, we still would uphold the board's action. As a result of the 1991 reassignment of points, which we have held was proper in light of the Salamon grievance settlement, the plaintiff received an assignment of sixty-one points. Thus, even without the reassignment in 1992, the plaintiff still would have been the teacher with the fewest points in 1992 and, therefore, subject to termination.

you or your supervisor request an update for new information, the points assigned will remain valid." When the plaintiff received this letter he had a choice—he could either retain the point assignment that he had received in 1991, i.e., sixty-one, or have his supervisor submit an updated report and accept the new points assigned as a result of the new report. The plaintiff, at the prompting of his immediate supervisor, chose the latter.

The plaintiff testified at his termination hearing before the panel of arbitrators that, although he thought that the point assignments could not be evaluated again, "Fitzgerald told me she felt that [b]y submitting an update I could possibly raise my points." The plaintiff "wrote a letter to Mrs. Fitzgerald and wrote a letter to Mr. [Bob] Anderson, my immediate supervisor [at the high school][11] . . . . I said very clearly I didn't feel [the evaluation] could be done, if they felt it could be done, and they had factual information they could attest to which represented my character as a teacher and my classroom performance," they should submit that information. In response, Fitzgerald received a letter from Anderson attesting to the plaintiff's credentials and submitted an updated anecdotal report to the superintendent. Burke also testified that the plaintiff's immediate supervisor requested an update for new information in 1992. The point assignment of sixty-one that the plaintiff received as a result of the 1992 evaluation resulted in his contract termination.

The plaintiff argues that neither he nor his immediate supervisor requested an update for new information because their actions in submitting the updated anecdotal report were prompted by the letter that the

---

[11] Anderson was the plaintiff's immediate supervisor at the high school where the plaintiff held four-tenths of a position.

plaintiff had received from Burke. The letter from Burke, however, was not a notification of a mandatory department-wide reevaluation regardless of whether the members of the department submitted updated anecdotal reports. Rather, it was a "form letter" indicating that the plaintiff had the option either to be reevaluated or to retain his last point assignment. The plaintiff, through his immediate supervisor, chose to submit an updated anecdotal report and be reevaluated because his points potentially could have been increased.

The record reflects substantial evidence on which the board properly could rely in adopting the dissenting arbitrator's finding number twelve. See *Huck* v. *Inland Wetlands & Watercourses Agency*, supra, 203 Conn. 542 (" 'The reviewing court must take into account [that there is] contradictory evidence in the record . . . but "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence . . . ." ' "). On the other hand, evidence that the plaintiff or his immediate supervisor did not request an update of the plaintiff's anecdotal report is contrary not only to the testimony of others, but also to the plaintiff's own testimony and to the exhibits produced at the hearing. Because substantial evidence existed to support the dissenting arbitrator's finding number twelve, the board did not act illegally when it adopted that finding. See *Rado* v. *Board of Education*, supra, 216 Conn. 555.

## II

The plaintiff next claims that the board violated his due process rights[12] when it did not adequately apprise

---

[12] "The fourteenth amendment to the United States constitution prohibits any state from depriving any person of 'life, liberty, or property, without due process of law.' Article [first], section eight of our state constitution

him of the reason and factual basis for his termination. "[A] tenured teacher discharged for cause under . . . § 10-151 [d] is entitled, as a matter of constitutional law, to a written statement of the decision reached, the reasons for the determination, and a fair summary of the evidence relied upon." *Lee* v. *Board of Education*, 181 Conn. 69, 79, 434 A.2d 333 (1980).

In the present case, the plaintiff had been informed by letter, dated June 17, 1992, that he was under consideration for termination due to the elimination of the position to which he had been appointed. See General Statutes § 10-151 (d) (5). The plaintiff requested a hearing before an impartial panel, which was held on August 19, 1992. The board subsequently held a public hearing to consider the termination of the plaintiff's employment. Finally, the plaintiff was notified in writing that, "after considering the findings and recommendations of the Hearing panel," the board voted to terminate his employment. The letter stated that the reason for the termination was the elimination of his teaching position and the board's acceptance of findings numbers eleven and twelve of the dissenting arbitrator. By incorporating the findings of the panel of arbitrators and specifying that it had adopted the dissenting arbitrator's findings numbers eleven and twelve, the board adequately apprised the plaintiff of a fair summary of the evidence upon which it had relied.

A board's decision does not have to be recited in great detail; *Bartlett* v. *Krause*, 209 Conn. 352, 380, 551 A.2d 710 (1988); but, rather, must be sufficient to allow the reviewing court to determine whether the board acted

contains the same prohibition and is given the same effect as the fourteenth amendment to the federal constitution. *Miller* v. *Heffernan*, 173 Conn. 506, 516, 378 A.2d 572 (1977), appeal dismissed, 434 U.S. 1057, 98 S. Ct. 1226, 55 L. Ed. 2d 758 (1978). Our analysis of the plaintiff's claim, therefore, encompasses both provisions." *Lee* v. *Board of Education*, 181 Conn. 69, 71–72, 434 A.2d 333 (1980).

illegally. *Lee* v. *Board of Education*, supra, 181 Conn. 82 n.12. The plaintiff was notified, in writing, of the decision of the board, the reasons for the determination and a fair summary of the evidence relied upon by the board. Thus, the plaintiff was given adequate notification of the reasons for the termination of his employment and recitation of the evidence that was sufficient to allow the court to review the board's action. Therefore, the trial court properly dismissed the plaintiff's appeal.

The judgment is affirmed.

In this opinion the other justices concurred.