GLORIA ROGERS *v.* BOARD OF EDUCATION OF
THE CITY OF NEW HAVEN
(SC 16176)

McDonald, C. J., and Borden, Katz, Palmer, Sullivan, Callahan and
Gaffney, Js.

Argued January 12—officially released May 3, 2000*

\* May 3, 2000, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

*John M. Gesmonde*, for the appellant (plaintiff).

*William H. Narwold*, with whom were *Charles D. Ray* and, on the brief, *Jay E. Bovilsky*, for the appellee (defendant).

*Opinion*

CALLAHAN, J. The plaintiff, Gloria Rogers, appeals from the judgment of the trial court dismissing her appeal from a decision of the defendant board of education of the city of New Haven (board) terminating her contract of employment. In her appeal, the plaintiff claims that the trial court incorrectly concluded that: (1) her dismissal by the defendant did not violate her state and federal procedural due process rights; and (2) there was substantial evidence in the record to support the board's conclusions. We affirm the judgment of the trial court.

The relevant facts as found by the hearing panel, and adopted by the board, are as follows. The plaintiff was a teacher in the New Haven school system since 1984. From that time until the date of the incident prompting her termination, her record was unblemished. On March 27, 1997, the plaintiff was a tenured teacher and was employed as an assistant principal at Jackie Robinson Middle School in New Haven. On that day, the plaintiff was summoned from an assembly for seventh and eighth grade students to a fifth and sixth grade physical education class taught by Marie Young, who had indicated that a "serious problem" had arisen and that there

were no other administrators available to handle it. The plaintiff asked Cassandra Lang, a school security guard who was also in attendance at the assembly, to accompany her to the gymnasium area.

The plaintiff met Young and her twenty-two female students in the gymnasium locker room at approximately 1:00 p.m. Young informed the plaintiff that D, a student in her class, had reported a theft of $91. Upon further inquiry of D, the plaintiff concluded that only $40 was actually missing.

The plaintiff knew that the students in the class were from different neighborhoods and that interneighborhood problems often led to fighting among the students. Fearing that the theft could lead to violence outside the school, she concluded that the matter must be resolved that day, before the start of a three day weekend. The plaintiff searched student S, a suspect in the theft, in the locker room, asking her to remove her shoes and socks and to pull out her pockets. She then ordered Young and Lang to search all the students individually in Young's office, which adjoined the locker room, while she conducted a search of the locker room. Although the plaintiff never entered Young's office while the searches she ordered were being conducted, she was in the locker room directly outside Young's office during that time.

Prior to commencing the searches ordered by the plaintiff, Young loudly and emphatically warned the girls, "All right, line up, if that money is in this gym, we're going to find it, even if it's in your panties, because you could hide it anywhere." S, who already had been searched by the plaintiff, was the first student searched in the office by Young and Lang. The plaintiff wrote late passes for the students at a desk outside Young's office while the searches were being conducted because the searches extended into the next class period. After

being searched, some of the students made comments to each other about what had happened in Young's office. Student S stated: "It's nasty; they made me pull down my pants and my panties"; other students made similar comments as they left Young's office, seeming to indicate that a "strip search" was being conducted. The plaintiff was either at the desk directly outside Young's office or otherwise within earshot of those students making comments while the comments were being made. The demeanor and temperament of the students indicated that something was wrong, and the plaintiff should have been aware that something was wrong. The plaintiff, however, did nothing either to investigate how the searches of the girls were being conducted or to halt the searches, even though she was in charge until the search incident concluded. In fact, the plaintiff left the area before the searches she had ordered were completed and without informing Young or Lang.

The board's administrative procedure manual provides that "[s]chool officials have the duty to protect the health, safety and welfare of all students under their authority. . . . At no time should school officials conduct a search which requires a student to remove more clothing than his/her shoes or jacket. . . . 'Strip searches' of students by employees of this school district are prohibited." The plaintiff had read and reviewed the search and seizure policy of the board prior to the date of the incident. The plaintiff further understood her duty as a school official to protect the students and her responsibility as an administrator "for enforcing all of the policies of the Board of Education."

After the New Haven superintendent of schools informed the plaintiff by letter that termination of her contract was being considered on the basis of the results of an investigation of the search incident, the plaintiff requested a hearing by an impartial three per-

son panel pursuant to General Statutes § 10-151 (d).[1]

[1] General Statutes § 10-151 (d) provides: "The contract of employment of a teacher who has attained tenure shall be continued from school year to school year, except that it may be terminated at any time for one or more of the following reasons: (1) Inefficiency or incompetence; (2) insubordination against reasonable rules of the board of education; (3) moral misconduct; (4) disability, as shown by competent medical evidence; (5) elimination of the position to which the teacher was appointed or loss of a position to another teacher, if no other position exists to which such teacher may be appointed if qualified, provided such teacher, if qualified, shall be appointed to a position held by a teacher who has not attained tenure, and provided further that determination of the individual contract or contracts of employment to be terminated shall be made in accordance with either (A) a provision for a layoff procedure agreed upon by the board of education and the exclusive employees' representative organization or (B) in the absence of such agreement, a written policy of the board of education; or (6) other due and sufficient cause. Nothing in this section or in any other section of the general statutes or of any special act shall preclude a board of education from making an agreement with an exclusive bargaining representative which contains a recall provision. Prior to terminating a contract, the superintendent shall give the teacher concerned a written notice that termination of such teacher's contract is under consideration and, upon written request filed by such teacher with the superintendent, within seven days after receipt of such notice, shall within the next succeeding seven days give such teacher a statement in writing of the reasons therefor. Within twenty days after receipt of written notice by the superintendent that contract termination is under consideration, such teacher may file with the local or regional board of education a written request for a hearing. A board of education may designate a subcommittee of three or more board members to conduct hearings and submit written findings and recommendations to the board for final disposition in the case of teachers whose contracts are terminated. Such hearing shall commence within fifteen days after receipt of such request, unless the parties mutually agree to an extension, not to exceed fifteen days (A) before the board of education, or a subcommittee of the board, (B) if indicated in such request or if designated by the board before an impartial hearing panel or, (C) if the parties mutually agree, before a single impartial hearing officer chosen by the teacher and the superintendent. If the parties are unable to agree upon the choice of a hearing officer within five days after their decision to use a hearing officer, the hearing shall be held before the board or panel, as the case may be. The impartial hearing panel shall consist of three members appointed as follows: The superintendent shall appoint one panel member, the teacher shall appoint one panel member, and those two panel members shall choose a third, who shall serve as chairperson. If the two panel members are unable to agree upon the choice of a third panel member within five days after the decision to use a hearing panel, the third panel member shall be selected with the assistance

The majority of the panel found that "[the plaintiff] knew or should have known from the demeanor of the students and the claims made by the students searched, in reference to the searches, that something was amiss and that she should have immediately checked to see what was going on in the office where the children were being searched." Nonetheless, a majority of the panel concluded that the plaintiff was not culpable and recommended that she not be punished. The board rejected the panel's recommendation and terminated the plaintiff's employment, relying on the factual findings of the majority, as well as referring to the factual findings of a dissenting panel member. Specifically, the board determined that, although the plaintiff knew or

of the American Arbitration Association using its expedited selection process and in accordance with its rules for selection of a neutral arbitrator in grievance arbitration. If the third panel member is not selected with the assistance of such association within five days, the hearing shall be held before the board of education or a subcommittee of the board. Within seventy-five days after receipt of the request for a hearing, the impartial hearing panel, subcommittee of the board or hearing officer, unless the parties mutually agree to an extension not to exceed fifteen days, shall submit written findings and a recommendation to the board of education as to the disposition of the charges against the teacher, and shall send a copy of such findings and recommendation to the teacher. The board of education shall give the teacher concerned its written decision within fifteen days of receipt of the written recommendation of the impartial hearing panel, subcommittee or hearing officer. Each party shall pay the fee of the panel member selected by it and shall share equally the fee of the third panel member or hearing officer and all other costs incidental to the hearing. If the hearing is before the board of education, the board shall render its decision within fifteen days after the close of such hearing, and shall send a copy of its decision to the teacher. The hearing shall be public if the teacher so requests or the board, subcommittee, hearing officer or panel so designates. The teacher concerned shall have the right to appear with counsel at the hearing, whether public or private. A copy of a transcript of the proceedings of the hearing shall be furnished by the board of education, upon written request by the teacher within fifteen days after the board's decision, provided the teacher shall assume the cost of any such copy. Nothing herein contained shall deprive a board of education or superintendent of the power to suspend a teacher from duty immediately when serious misconduct is charged without prejudice to the rights of the teacher as otherwise provided in this section."

should have known that the student searches were improper, she did nothing to investigate or halt them, and that she had neglected her duty to enforce board policies and to protect the students' welfare. The plaintiff's administrative appeal was dismissed by the trial court.The plaintiff appealed from that judgment to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c). We affirm the judgment of the trial court.

I

The plaintiff first claims that her state and federal due process rights were violated in the following ways: (1) by the board's rejection of the findings of fact made by the hearing panel in favor of facts found only by the dissenter on the panel; (2) by the board's reliance on ex parte statements made by parents of the students searched; and (3) by the admission before the hearing panel of the hearsay statements of two students. We disagree with the plaintiff.

"When considering termination of a tenured teacher's employment contract, a school board acts, like an administrative agency, in a quasi-judicial capacity. . . . *Barnett* v. *Board of Education*, 232 Conn. 198, 206, 654 A.2d 720 (1995); see also *Tomlinson* v. *Board of Education*, 226 Conn. 704, 712, 629 A.2d 333 (1993). A school board has discretion to accept or reject a recommendation from an impartial hearing panel, though it is bound by the panel's findings of fact unless unsupported by the evidence. . . . The board is bound by the panel's findings of fact, but not by its legal conclusions or by its recommendations. . . . *Barnett* v. *Board of Education*, supra, 206; see also *Rado* v. *Board of Education*, 216 Conn. 541, 555, 583 A.2d 102 (1990); *Petrino* v. *Board of Education*, 179 Conn. 428, 430, 426 A.2d 795 (1980).

"Judicial review of the school board's administrative decision follows established principles of administrative law. The court's ultimate duty is only to decide whether, in light of the evidence, the [board] has acted unreasonably, arbitrarily, illegally, or in abuse of its discretion. . . . Conclusions of law reached by the [board] must stand if the court determines that they resulted from a correct application of the law to the facts found and could reasonably and logically flow from such facts. . . . *Barnett* v. *Board of Education,* supra, 232 Conn. 207–208; see also *Ottochian* v. *Freedom of Information Commission,* 221 Conn. 393, 397, 604 A.2d 351 (1992); *New Haven* v. *Freedom of Information Commission,* 205 Conn. 767, 774, 535 A.2d 1297 (1988); *Griffin Hospital* v. *Commission on Hospitals & Health Care,* 200 Conn. 489, 496, 512 A.2d 199, appeal dismissed, 479 U.S. 1023, 107 S. Ct. 781, 93 L. Ed. 2d 819 (1986)." (Internal quotation marks omitted.) *Sekor* v. *Board of Education,* 240 Conn. 119, 125–26, 689 A.2d 1112 (1997).

A

The plaintiff's initial due process argument is that the board incorrectly rejected the conclusions and recommendations of the majority of the hearing panel, which essentially were that the plaintiff was not incompetent or insubordinate. Instead, the plaintiff contends, the board improperly relied on the findings of the dissenting panel member to reach its decision. The dissenting panel member made numerous specific findings adverse to the plaintiff and recommended that her employment be terminated.[2] The plaintiff's conclusion that the board acted improperly rests on two principal grounds: first, that the board rejected the panel's ulti-

[2] As we note subsequently, the dissenter's relevant findings dealt with the specific nature of the searches and of the comments made by students in the presence of the plaintiff.

mate recommendation; and second, that the board stated in its decision that it had "discussed the additional Findings of Panel member John M. Romanow [the dissenter]." We disagree with the plaintiff's argument.

We reiterate the well established principle that the board is bound only by the *factual findings* of the hearing panel and may accept or reject the panel's legal conclusions and recommendations. *Sekor* v. *Board of Education*, supra, 240 Conn. 125. A rejection by the board of the legal conclusions or recommendations of the panel is not a rejection of the factual findings, and is not improper.

The board's decision, however, makes clear that the panel majority's factual findings alone support its conclusion. The board "accepts and adopts the 157 findings of the majority of the Panel . . . and incorporates those findings of fact in [its] decision." The board's analysis cites extensively and exclusively to the panel majority's findings of fact. Prior to its analysis, the board did state that it had "discussed" the dissenter's findings. The dissenter's findings of fact, however, were not referred to in the board's analysis and were not essential to its conclusion. The relevant findings of the dissenter dealt with the specific nature of the searches and of the comments made by students in the presence of the plaintiff. These findings did not contradict the majority's finding that the manner of the searches "exceeded the type of search authorized by the Administrative Procedures Manual" and that the plaintiff knew or should have known that "something out of the ordinary had happened" and that "something was amiss." We conclude from this record, therefore, that the board's decision rests squarely upon the panel majority's findings and not on the findings of the dissent.[3]

---

[3] We, therefore, disagree with the trial court's apparent characterization of the board's decision as resting equally on factual findings of the majority as well as factual findings of the dissenter.

B

The plaintiff next claims that the trial court improperly determined that the board had not been influenced by certain ex parte statements made by the parents of some of the students involved in the search incident. We disagree.

The following additional facts are necessary to the disposition of this claim. The record indicates that some parents made statements to the members of the board regarding the search of their children, and how they and their children were reacting. Most of these comments were made at public meetings of the board of education at which the plaintiff was not present. New Haven Mayor John DeStefano, a board member, indicated at a special meeting of the board on January 30, 1998, that he had "received some mail about this" and had "heard from parents as he sat up here as a Board member and parents talked about what happened . . . ." The board's attorney advised DeStefano that the mailings could not be considered and that the statements of parents were relevant only insofar as they did not conflict with the findings of fact of the majority of the impartial hearing panel.

We have stated consistently that boards of education "[have] a duty under [General Statutes] § 10-151 (b) to afford a tenured teacher a fair hearing and to terminate the employment contract only for one or more of six [statutorily prescribed] reasons, which must be supported by a preponderance of the evidence." *Cantino* v. *Board of Education*, 174 Conn. 414, 417, 389 A.2d 754 (1978). Whether the fair hearing requirement has been satisfied, however, is not measured by the same standard used to make that determination in other administrative contexts, and for good reason.

Although a board of education considering termination of a tenured teacher's employment contract acts in

a quasi-judicial capacity; *Barnett* v. *Board of Education*, supra, 232 Conn. 198; a board of education is not an administrative agency as defined by the Uniform Administrative Procedure Act (UAPA); General Statutes § 4-166 et seq.; and is not subject to the provisions of the UAPA. See *Mauriello* v. *Board of Education*, 176 Conn. 466, 469, 408 A.2d 247 (1979). General Statutes § 4-181, a provision of the UAPA, strictly prohibits the receipt of ex parte communications by hearing officers and agency members in contested cases. Applying that standard, we have concluded that "once it has been demonstrated that an improper ex parte communication has occurred, a presumption of prejudice arises. Although this presumption is rebuttable, the burden of showing that a prohibited ex parte communication between a commission and an applicant has not prejudiced a party must be allocated to those seeking to uphold the validity of the commission's decision." *Blaker* v. *Planning & Zoning Commission*, 212 Conn. 471, 480, 562 A.2d 1093 (1989).

This standard, however, is ill suited in the context of boards of education, where an impartial hearing panel has acted as the factfinder. Unlike most administrative agencies, a board of education has a special relationship with and responsibility to the community. A board of education has the task of overseeing the local school system as well as serving as the vehicle for state and local interests vis-a-vis the school system. See General Statutes § 10-220; T. Mooney, A Practical Guide to Connecticut School Law (1994) pp.5–6; S. Romer, The Handbook of Connecticut School Law (1990) § 2.23, pp. 21–22. Public involvement and input is a regular feature of a board of education. See General Statutes § 1-225, formerly General Statutes § 1-21; New Haven Public Schools Policy Series 1000, No. 1120.[4] A

---

[4] New Haven Public Schools Policy Series 1000, Policy No. 1120 provides in relevant part: "The regular and special meetings of the Board of Education are open to the public and representatives of the press except that a part of any meeting may be designated an executive session as provided by

board of education also has the responsibility to adjudicate matters such as teacher terminations. Because of the board's very nature, ex parte communications are to be expected. In the present case, for instance, it is not surprising that parents would express their views at the public board meetings during the same time period the board was considering the plaintiff's termination.

In the present case, the plaintiff requested an impartial hearing panel, which acted as a factfinder. Ex parte communications present the greatest danger at the hearing stage because the panel as a factfinder has broad discretion in assessing credibility and weighing the evidence. The board, on the other hand, has discretion to terminate a tenured teacher's employment contract only when the findings of fact support that decision. Thus, a complaining party is protected against the negative impact of ex parte communications by the requirement that the board's decision must be supported by and be defensible on the findings of fact of the hearing panel alone.

Our approach to ex parte communications must preserve the integrity of a teacher's fair hearing right while recognizing the reality that parents in a case like this will voice their concerns to the board. With this in mind, we distinguish ex parte communications made to the impartial hearing panel from ex parte communications made to the board of education. Ex parte communications made to an impartial hearing panel will be presumed prejudicial, subject to rebuttal, as in other administrative contexts. Ex parte communications made to a board of education acting upon the factual findings of an impartial hearing panel will not be viewed as presumptively prejudicial as long as the board's deci-

law. . . . The Board of Education welcomes participation of interested organizations and individuals. . . ."

sion rests upon a factual basis determined by the panel free from any taint of ex parte influence. Instead, the party challenging the board's action should bear the burden of demonstrating both that improper ex parte contact occurred and that the contact prejudiced that party. This distinction makes sense because the hearing panel's primary responsibility is that of an impartial factfinder, whereas the board's ultimate decision-making role is constrained by the panel's findings. Because the plaintiff has failed to demonstrate any prejudice to her, we reject this claim.

C

The plaintiff further claims that her right to a fair hearing was violated by the panel's admission of hearsay statements of two students. The plaintiff claims that the hearing panel should not have allowed students L and T to testify to statements made by other students because those statements constituted hearsay. We are not persuaded.

Certain additional facts are necessary.[5] During the panel hearing, L testified to statements made by S, the first student to have been searched. The plaintiff did not object. T also testified before the panel as to statements that S had made after being searched. T stated that S had said, "It's nasty; they made me pull down my pants and panties." Again, the plaintiff did not object. The plaintiff cross-examined both L and T.

There is no prohibition against the admission of hearsay evidence in teacher termination proceedings. See *Paquette* v. *Hadley*, 45 Conn. App. 577, 581, 697 A.2d 691 (1997) (hearsay generally admissible at administrative hearings). Moreover, even if hearsay were inadmissible,

_____

[5] Although in her brief the plaintiff does not cite specifically to the relevant pages in the transcript or quote the exact statements that she asserts are hearsay, we were able to discern those statements and to locate the relevant portions of the transcript.

the statements at issue are not hearsay. Hearsay is an out-of-court statement offered for the truth of the matter asserted therein. *State* v. *King*, 249 Conn. 645, 670, 735 A.2d 267 (1999); *State* v. *Blades*, 225 Conn. 609, 632, 626 A.2d 273 (1993). " 'A statement made out of court is not hearsay unless it is offered to establish the truth of the facts contained in the statement.' *State* v. *James*, 211 Conn. 555, 576, 560 A.2d 426 (1989); accord *State* v. *Esposito*, 223 Conn. 299, 315, 613 A.2d 242 (1992)." *State* v. *Booth*, 250 Conn. 611, 635–36, 737 A.2d 404 (1999).

Our review of the pertinent transcript reveals that the line of questioning pursued with both T and L indicates that S' statements were not offered for their truth but rather for the relevant purpose of showing that the statements had been made in the presence of the plaintiff.[6] Therefore, we conclude that the statements were not hearsay and were properly admitted by the panel.

## II

The plaintiff next claims that the trial court improperly concluded that the board's decision was not "unreasonable, arbitrary or capricious or characterized by

[6] The transcript of the direct examination of T reads in relevant part:

"[Attorney Jay Bovilsky]: After S went into Miss Young's office, where did [the plaintiff] go?

"A. She was sitting at the desk.

"Q. And when S came out, did S say anything?

"A. Yes.

"Q. What did she say?

"A. She said, 'It's nasty; they made me pull down my pants and my panties.' . . .

"Q. What did [the plaintiff] do when S came out of the office?

"A. She didn't say nothing. She just gave S a pass to the room. . . .

"Q. As the girls came out of the office, what happened with those girls as they came out?

"A. They was saying the same thing S said: It was nasty; stuff like that."

The sealed transcript of the examination of L reveals that the questions and answers followed along similar lines.

abuse of discretion, or a clearly unwarranted exercise of discretion, based on the findings of fact of the majority of the impartial hearing panel . . . ." Specifically, the plaintiff argues that: (1) there is insufficient evidence to support the board's conclusion that she was incompetent or inefficient or that there was "other due and sufficient cause" for termination of her contract; and (2) as a matter of law, a single act of incompetence or inefficiency cannot provide the basis for her termination. We disagree.

A

"Judicial review of an administrative agency decision requires a court to determine whether there is substantial evidence in the administrative record to support the agency's findings of basic fact and whether the conclusions drawn from those facts are reasonable. . . . This so-called substantial evidence rule is similar to the sufficiency of the evidence standard applied in judicial review of jury verdicts, and evidence is sufficient to sustain an agency finding if it affords a substantial basis of fact from which the fact in issue can be reasonably inferred. . . . [I]t imposes an important limitation on the power of the courts to overturn a decision of an administrative agency . . . and [provides] a more restrictive standard of review than standards embodying review of weight of the evidence or clearly erroneous action. . . . The United States Supreme Court, in defining substantial evidence in the directed verdict formulation, has said that it is something less than the weight of the evidence, and [that] the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence. . . ." (Citations omitted; internal quotation marks omitted.) *Sweetman* v. *State Elections Enforcement Commission*, 249 Conn. 296, 331–32, 732 A.2d 144 (1999).

"The essential inquiry, when a board decides to terminate a teacher for incompetence under § 10-151, is whether the teacher's overall performance falls below the requisite standard." *Sekor* v. *Board of Education,* supra, 240 Conn. 129. Stated otherwise, when a teacher's overall performance falls below a base standard, termination may be justified. See *Benke* v. *Neenan,* 658 P.2d 860, 861–62 (Colo. 1983) ("[c]ompetence indicates the ability to perform ably and above a minimum level of sufficiency . . . incompetence indicates the inability to perform"). The plaintiff was acting in her capacity as an assistant principal. As an administrator, her duties included the protection of her students' health and welfare, and the enforcement of the board's policies. The relevant question is whether the board acted within its discretion by concluding that those duties had not been fulfilled and that the plaintiff's performance had fallen below that required of an administrator in her position.

"The jurisdiction and discretion to determine what . . . may be [due and sufficient cause] rests in the hands of the school authorities." (Internal quotation marks omitted.) *Petrino* v. *Board of Education,* supra, 179 Conn. 430. That determination must conform, of course, to the meaning of "other due and sufficient cause." General Statutes § 10-151 (d). "[We have] treated that phrase as equivalent to good cause, citing with evident approval a definition of that term taken from *Rinaldo* v. *School Committee of Revere,* 294 Mass. 167, 169, 1 N.E.2d 37 (1936): Good cause includes any ground which is put forward by the [school] committee in good faith and which is not arbitrary, irrational, unreasonable, or irrelevant to the committee's task of building up and maintaining an efficient school system. In *Tucker* [v. *Board of Education,* 177 Conn. 572, 418 A.2d 933 (1979)], we declared that the decision to terminate must be reached after a careful examination of all pertinent factors relating to the particular situation,

with due consideration of the effect the teacher's conduct will have on the school authorities as well as on the students. Id., 580. Thus, in deciding whether particular conduct constitutes due and sufficient cause for termination, the impact of that conduct upon the operation of the school is a significant consideration." (Internal quotation marks omitted.) *Rado* v. *Board of Education*, supra, 216 Conn. 554.

The majority's findings of fact support the conclusion of the board that the termination criteria of incompetence and inefficiency and other due and sufficient cause had been met. A majority of the hearing panel found that the plaintiff "knew or should have known from the demeanor of the students and the claims made by the students searched in reference to the searches that something was amiss and that she should have immediately checked to see what was going on in the office where the children were being searched." The panel further found that "[p]rior to taking the first girl into her office, Marie Young raised her voice and emphatically told the girls, '[a]ll right, line up, if that money is in this gym, we're going to find it, even if it's in your panties, because you could hide it anywhere.' " After being searched, some of the students made comments to each other about what had happened. The plaintiff was either at a desk directly outside Young's office or otherwise within earshot of those students making comments while those statements were made. The demeanor and temperament of the students indicated that something was wrong, and the plaintiff should have been aware of this.

The board's administrative procedure manual's search and seizure section provides that "[s]chool officials have the duty to protect the health, safety and welfare of all students under their authority. . . . At no time should school officials conduct a search which requires a student to remove more clothing than his/

her shoes or jacket. . . ." The plaintiff had read and reviewed that policy of the board prior to the incident. The plaintiff understood her duty as a school official to protect the students and her responsibility as an administrator for enforcing all of the policies of the board of education.

It is evident that the plaintiff's conduct implicated the well-being of the students as well as the operation of the school. The ability to protect students and enforce board policies was essential to the plaintiff's job. The board's determination that the plaintiff's failure to act under the circumstances constituted due and sufficient cause for her termination was not an abuse of its discretion.

B

Having determined that there was sufficient evidence to support the board's decision to terminate the plaintiff's employment contract on the basis of incompetence and other due and sufficient cause, we next consider the plaintiff's claim that the single incident in this case cannot, as a matter of law, justify termination. Specifically, the plaintiff asserts that termination is an arbitrary and capricious punishment for one incident when weighed against an otherwise unblemished record. We disagree.

Section 10-151 (d) provides that a board of education has discretion to terminate a tenured teacher for one or more of six enumerated reasons, including incompetence and inefficiency and other due and sufficient cause. Whether termination is justifiable on the basis of a single incident is a qualitative not quantitative analysis; one serious incident can suffice. See *Redcay* v. *Board of Education*, 130 N.J.L. 369, 370, 33 A.2d 120 (1943), aff'd, 131 N.J.L. 326, 36 A.2d 428 (1944); *In re Shurgin*, 83 App. Div. 2d 665, 666, 442 N.Y.S.2d 212

(1981), aff'd, 56 N.Y.2d 700, 436 N.E.2d 1324, 451 N.Y.S.2d 722 (1982).

Although we recognize that this one incident exists against the backdrop of an excellent record, we cannot ignore the fact that the plaintiff's action compromised the privacy of the students whom it was her duty to protect through the enforcement of the board's policies.[7] Under these circumstances, we cannot conclude as a matter of law that the board's action was arbitrary and capricious or an abuse of discretion.

The judgment is affirmed.

In this opinion the other justices concurred.

---

[7] Although we have concluded in other circumstances that termination was an arbitrary and capricious punishment for a single incident in an otherwise unblemished record, such a determination is rare and reserved for extraordinary circumstances. See *Tucker* v. *Board of Education*, supra, 177 Conn. 572.

In *Tucker*, the plaintiff, a tenured school teacher, had twice requested and was twice refused a two day leave of absence to take a trip with her husband. The Norfolk board of education warned her of the consequences of taking the leave without permission but she did so regardless. An impartial hearing panel that was convened pursuant to § 10-151 determined that the plaintiff's conduct constituted insubordination but recommended against termination. The board nonetheless terminated the plaintiff's employment contract on the ground of insubordination. Although this court agreed that facts supported the finding of insubordination, we concluded that "the drastic disciplinary action of dismissal constituted exceedingly excessive punishment for the plaintiff's misconduct, and an abuse of discretion, especially in the light of the plaintiff's excellent and unblemished school record as a capable, dedicated teacher." *Tucker* v. *Board of Education*, supra, 177 Conn. 581–82.

Although the plaintiff's conduct is an allegedly negligent omission in this case as opposed to the wilful insubordination in the *Tucker* case, the plaintiff's inaction exposed the students not only to potential violations of rights but, more practically, to potential emotional harm. Under the circumstances, we cannot say that the board abused its discretion in terminating the plaintiff's employment.