DECISION
Petitioner Bethany St. Pierre ("Petitioner" or "St. Pierre") appeals from a decision of the Rhode Island Board of Regents for Elementary and Secondary Education Appeals Committee ("Board of Regents" or "Appeals Committee") affirming the decisions of the Commissioner of Education ("Commissioner") and the Smithfield School Committee ("School Committee") which found good and just cause to support termination of St. Pierre from her position as a teacher in the Smithfield School Department. Jurisdiction is pursuant to G.L. 1956 § 42-35-15.
 I Facts and Travel
The salient facts of this case are not in dispute. In September of 2006, Petitioner was employed as a teacher with the Smithfield School Department ("School Department"). At the time, St. Pierre was a tenured teacher of social studies, having *Page 2 
taught American history and civics at Smithfield High School for six years.[1] Throughout her time at Smithfield High, St. Pierre enjoyed a sterling reputation amongst her colleagues and was well-liked by her students. Prior to the incident that gave rise to the case at bar, St. Pierre had no adverse disciplinary history according to the records of her formal evaluations conducted by the School Department.
Notwithstanding Petitioner's unblemished personnel record, St. Pierre sometimes undertook an unorthodox approach to pedagogical concerns. In an effort to foster camaraderie between herself and her pupils, St. Pierre would, on occasion, perform what she referred to as "the stapler trick" for the students in her class. To wit, Petitioner would conduct her class in the spirit of a vaudevillian magic show in which St. Pierre played the role of master magician while a student assumed the role of the proverbial "volunteer from the audience." The stapler trick itself was a rudimentary illusion wherein St. Pierre would hold a loaded stapler in close proximity to a student's skull and depress the head of the stapler in an attempt to create the impression that a single staple had pierced the student's scalp. In fact, the staple would be ejected from the stapler and fall harmlessly into the student's hair. By her own admission, St. Pierre had performed the trick in class at least a half-dozen times without incident. However, on September 11, 2006, Petitioner's performance was less than successful.
That day, the students in Petitioner's tenth grade American history class, having heard tell of the stapler trick, asked St. Pierre if she would perform the trick for them. *Page 3 
After one of the students volunteered to participate in the demonstration, Petitioner granted the students' request. Stapler in hand, St. Pierre approached the volunteer and performed the trick. But, unbeknownst to St. Pierre, as she walked back to her desk, a fine line of blood began to trickle down the side of the volunteer's face.
Moments later, nearby students took note of their classmate's injury and quickly alerted Petitioner to the situation. St. Pierre immediately returned to the desk of the volunteer and began to examine his head in an effort to locate the laceration. While St. Pierre was unable to determine the locus of the injury, she was able to determine that the bleeding had ceased. Subsequently, Petitioner procured a paper towel and wiped the line of blood off the volunteer's face.
After she wiped the blood away, St. Pierre asked the volunteer if he was all right. In response, the volunteer assured St. Pierre that he was fine. Consequently, rather than sending the volunteer to the school nurse for an examination or treatment, Petitioner told the volunteer to go to the bathroom and clean the area around the wound. The volunteer did as St. Pierre directed. Several minutes later, upon his return to the classroom, the volunteer reassured St. Pierre that he was fine. Satisfied that all was well, St. Pierre resumed her lesson plan.
At some point before class adjourned for the day, Petitioner indicated to her students that it would be for the best if what happened in the classroom stayed "within the classroom." (Decision of the Commissioner of Education, n. 4.) Shortly thereafter, the class period came to a close, and the students were dismissed for the day. For ten days afterward, the incident that accompanied the stapler trick remained "within the classroom."Id. *Page 4 
However, on September 21, 2006, after learning of the incident's occurrence, the volunteer's mother contacted the Principal of Smithfield High, Daniel P. Kelly ("Principal Kelly") and reported the details of the incident. Principal Kelly, learning of the incident for the first time, summoned St. Pierre to his office. During the meeting, which Petitioner attended accompanied by a union representative, St. Pierre acknowledged the fact that the incident had occurred and did not dispute the salient facts of the episode as it had been relayed to Principal Kelly. Later that day, St. Pierre submitted to Principal Kelly a one-page written statement wherein she recounted her recollection of the events that transpired on September 11, 2006.
The following week, Smithfield School Superintendent Robert O'Brien ("O'Brien") contacted St. Pierre via letter and informed her that the School Department was concerned about the events surrounding the stapler incident. Two days later, on September 27, 2006, O'Brien conducted an interview of St. Pierre in his office. Attorneys representing both Petitioner and the School Department were present, as were several other individuals.[2] At the meeting, St. Pierre again acknowledged the events of the underlying incident. Consequently, on September 29, 2006, O'Brien sent a letter to Petitioner informing her of his intention to recommend to the School Committee that she be terminated from her employment with the Smithfield School Department.
Several months later, on November 27th and November 29th of 2006, the full School Committee held closed session hearings on Superintendent O'Brien's recommendation to terminate. Over the course of both hearings, the School Committee *Page 5 
heard direct testimony from a number of parties. Among those who testified were the student volunteer, a fellow classmate of the volunteer, Principal Kelly, and Superintendent O'Brien. In addition, the School Committee admitted into evidence, interalia, the written statement penned by the Petitioner on September 21, 2006. At the close of the November 29th hearing, after considering all of the evidence presented, the School Committee found, by a vote of 4 to 1, that the underlying facts constituted just cause to terminate St. Pierre's employment with the School Department. Subsequently, the School Committee issued a formal written decision in the instant matter memorializing their decision to terminate St. Pierre.
On December 11, 2006, St. Pierre timely filed an appeal of the School Committee's decision with the office of the Commissioner of Education. Thereafter, hearings on Petitioner's appeal were held before Hearing Officer Kathleen S. Murray ("Murray" or "the Hearing Officer") on 10 different dates.[3] In February of 2008, Murray issued a 10-page written decision, approved by Commissioner Peter McWalters, wherein Murray denied and dismissed St. Pierre's appeal. In support of her decision, the Hearing Officer stated that the School Committee had proven, by a preponderance of the evidence, that on September 11, 2006, St. Pierre had
 positioned a stapler at or near a 10th grade student's head and pushed the stapler, ejecting the staple. The staple did penetrate the scalp of the student and when removed from his head, caused a stream of blood running down the side of his face. (She) then obtained a paper towel, gave it to the student and directed the student to the men's bathroom to clean up. . .Once the student had left the room, Ms. St. Pierre requested that the class not report or discuss the incident. Ms. St. Pierre failed to require that the student report to the nurse for an examination or care. *Page 6 
Additionally, Ms. St. Pierre failed to report the incident to either the Principal or the Superintendent of Schools. (Decision of the Commissioner of Education, 8) (citing Decision of the Smithfield School Committee, 1-2.)
Based on these facts, the Hearing Officer found that the School Committee had "established that Ms. St. Pierre had lapses in judgment which were sufficiently serious to constitute good and just cause for termination." Id. at 9. The decision concluded with the Hearing Officer's observation that
 although it is not likely that the conduct at issue here would ever be repeated and that, if retained Ms. St. Pierre would continue to be an excellent teacher, her relationship with district administrators has been irreparably affected. For this reason, and because it has demonstrated good and just cause, the decision of the Smithfield School Committee is sustained. Id. at 10.
Upon receipt of the Commissioner's decision, St. Pierre timely filed a second appeal with the Board of Regents' Appeals Committee. On August 14, 2008, a hearing on Petitioner's second appeal was held before the Appeals Committee. The testimony adduced therein was substantially the same as the testimony taken during the multiple hearings before the Hearing Officer. Subsequently, on October 1, 2008, the Appeals Committee issued a written decision wherein it affirmed the Commissioner's decision. On October 9, 2008, the decision of the Appeals Committee was stamped as received by the Town of Smithfield. The following day, Petitioner filed a timely appeal of the Board of Regents' decision with the clerk of the Superior Court.
Before this Court, Petitioner asserts that the Board of Regents improperly affirmed her termination in contravention of the Rhode Island Teachers' Tenure Act, G.L. § 16-13-1 et seq.
("the Act"). Specifically, Petitioner contends that the Board of Regents' decision to uphold her termination was improper because the facts that formed *Page 7 
the basis of the termination do not amount to "good and just cause" as contemplated by the Act. Conversely, the Board of Regents and the School Committee contend that the relevant provisions of the Act were not violated because the decision to terminate St. Pierre was based on competent evidence in the record sufficient to support a finding of "good and just cause" under the Act.
 II Standard of Review
In enacting the Controversies in School Matters Act, G.L. 1956 § 16-39-1 et seq., the Legislature created an express procedural route of review to be followed by "`[a]ny person aggrieved by any decision or doings of any school committee. . . .'"Ciccone v. Cranston School Committee,513 A.2d 32, 36 (R.I. 1986) (quoting Section 16-39-2). "Specifically, the route of review is from the [S]chool [C]ommittee to the State Commissioner of Elementary and Secondary Education and then to the State Board of Regents for Elementary and Secondary Education." Id. This multi-step procedure has been likened to a funnel. Environmental Scientific Corp. v. Durfee,621 A.2d 200, 207-08 (R.I. 1993). The School Committee, at the first level of review, sits "as if at the mouth of the funnel" and analyzes all of the evidence, opinions, and issues.Id. at 207. The Board of Regents, stationed at the "discharge end" of the funnel, does not receive the information considered by the School Committee firsthand. Id. at 207-08. Our Supreme Court has held, therefore, that the "further away from the mouth of the funnel that an administrative official is . . . the more deference should be owed to the fact finder." Id. at 208. *Page 8 
If, after all administrative appeals have been exhausted, a party is still aggrieved, "judicial review may be obtained . . . as provided in [the Rhode Island Administrative Procedures Act]." Section 16-39-4. This Court "sits as an appellate court with a limited scope of review" when reviewing the decisions of an administrative agency such as the Board of Regents. MineSafety Appliances Co. v. Berry, 620 A.2d 1255, 1259 (R.I. 1993). The applicable standard of review, codified at § 42-35-15(g), provides:
 The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
 (1) In violation of constitutional or statutory provisions;
 (2) In excess of the statutory authority of the agency;
 (3) Made upon unlawful procedure;
 (4) Affected by other error or law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.
Accordingly, in reviewing an agency decision, this Court is limited to an examination of the certified record in deciding whether the agency's decision is supported by substantial evidence.Center for Behavioral Health, R.I., Inc., v. Barros,710 A.2d 680, 684 (R.I. 1998) (citations omitted). Substantial evidence has been defined as "such relevant evidence that a reasonable mind might accept as adequate to support a conclusion, and means more than a scintilla but less than a preponderance."Wayne *Page 9 Distrib. Co. v. R.I. Comm'n for Human Rights,673 A.2d 457, 459 (R.I. 1996) (citing Newport ShipyardInc. v. R.I. Comm'n for Human Rights,484 A.2d 893, 896 (R.I. 1994)). Additionally, when examining the certified record, this Court may not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. Interstate Navigation Co. v. Div. of Pub.Utils. Carriers of R.I.,824 A.2d 1282, 1286 (R.I. 2003) (citations omitted). Therefore, this Court will "reverse factual conclusions of administrative agencies only when they are totally devoid of competent evidentiary support in the record." Baker v. Dept. of Employment Training Bd. ofReview, 637 A.2d 360, 363 (quoting Milardo v. CoastalRes. Mgmt. Council, 434 A.2d 266, 272 (R.I. 1981)).
 III Analysis A "Good and Just Cause"
The Rhode Island Teachers' Tenure Act, G.L. § 16-13-1 etseq. ("the Act"), provides, in pertinent part:
 Three (3) annual contracts within five (5) successive school years shall be considered evidence of satisfactory teaching and shall constitute a probationary period. Teachers who complete the probationary period shall be considered in continuous service and shall not be subject to annual renewal or nonrenewal of their contracts. No tenured teacher in continuous service shall be dismissed except for good and just cause. Section 16-13-3(a) (emphasis added).
Controlling case law from our Supreme Court interpreting or applying the "good and just cause" standard delineated in § 16-13-3 is notably sparse. Our Supreme Court has observed that there is a "significant distinction between a school committee's action to *Page 10 
suspend a teacher and its action to dismiss a teacher permanently."Ciccone, 513 A.2d at 35. Furthermore, in examining the Act in its entirety, our Supreme Court has recognized "an intent by the Legislature to `vest in the school committees of the cities and towns wider latitude when acting to suspend than that conferred upon them when the question is one of final dismissal.'" Id.
(quoting Royal v. Barry,91 R.I. 24, 32, 160 A.2d 572, 576 (1960)). Notably, however, this "latitude" refers to the procedural prescriptions that governing authorities must adhere to when initiating an adverse action against a teacher, rather than latitude with respect to the determination of substantive behavior that constitutes "good and just cause" to support termination under the Act.[4] *Page 11 
A number of legal authorities have noted that the phrase "good and just cause," as used in the context of a Teachers' Tenure Act, does not readily lend itself to a fixed standard. 68 Am.Jur.2d,Schools, § 231 (citations omitted); see also New MexicoState Bd. of Ed. v. Stoudt, 571 P.2d 1186, 1189 (N.M. 1977) ("The words `for any other good and just cause' have no reasonably defined meaning in the law."). Other authorities have observed that the phrase includes "any ground that is put forth by the school board in good faith and which is not arbitrary, irrational, unreasonable or irrelevant to the task of building and maintaining an efficient school system." 78 C.J.S., Schools andSchool Districts, § 395 (citing School Committee ofFoxborough v. Koski,8 Mass. App. Ct. 870, 391 N.E.2d 708 (1979)); see also Board ofEduc. of West Yuma School Dist. RJ-1 v. Flaming,938 P.2d 151, 159 (Colo. 1997) ("[G]ood and just cause includes any cause bearing a reasonable relationship to the teacher's fitness to discharge her duties or which materially and substantially affects performance."). Accordingly, "a decision to terminate a tenured teacher must be reached after a careful examination of all the pertinent factors relating to the situation, with due consideration of the effect the teacher's conduct will have on the school authorities as well as on the students." 78 C.J.S. at § 392 (citing Tucker v. Board of Ed. ofTown of Norfolk, 177 Conn. 572, 418 A.2d 933 (1979)).
 B Progressive Discipline and Cited Precedent
Petitioner contends, inter alia, that the School Committee must prove repetitive and/or intentional behavior, at minimum, to legally support termination of a tenured teacher pursuant to the "good and just cause" standard of the Act. Put another way, Petitioner's argument is based on the principle of progressive discipline. In the context *Page 12 
of the employer-employee relationship, progressive discipline is utilized as "a tool to bring about change in the behavior of employees, reserving termination for those guilty of serious offenses and those who have run the gamut of progressive discipline and have shown themselves to be incorrigible." 1 Bornstein, Gosline, and Greenbaum, Labor and EmploymentArbitration, § 14.03[3] (2009). The use of progressive discipline in the context of the employer-employee relationship has been recognized as appropriate by our Supreme Court, which has previously stated that employers "must ensure that the punishment for a work-related offense is proportionate to the offense committed."Martone v. State of Rhode Island,611 A.2d 384, 385 n. 1 (R.I. 1992).
Petitioner asserts that a number of decisions recently issued by the Commissioner of the Department of Education support her contention that repeated offenses and resort to progressive discipline are preconditions that must be present in a given case before termination of a tenured teacher can properly come to pass. See e.g. Providence School Board v. Ana Faris, Decision 0051-06; Donald Proto v. Providence School Board, Decision 0003-06; Providence School Board v. Michael Dame, Decision 0037-05; William Hicks v. Cumberland School Committee, Decision 0033-07 (termination of tenured teachers upheld based, in part, on pre-existing disciplinary issues). Pursuant to the foregoing decisions, counsel for the Petitioner argues that St. Pierre, who had no adverse disciplinary history at the time of the incident at issue, appears to be the ideal candidate for progressive discipline.[5] *Page 13 
However, the principle of progressive discipline cannot be applied to all disciplinary actions in the workplace without fail because of certain inherent limitations. That is to say, "certain [workplace] offenses are so unacceptable as to preclude more than one such violation. . . . The rationale for termination without progressive discipline in such cases is that the infraction is so obviously unacceptable that the employee should have known that it would not be tolerated." 1 Bornstein at § 14.03[3]. Accordingly, "[w]hether termination is justifiable on the basis of a single incident is a qualitative, not quantitative analysis; one serious incident can suffice." Rogers v. Board of Educ. of City of New Haven,749 A.2d 1173, 1184 (Conn. 2000) (citations omitted).
 C The Decision To Terminate Petitioner
At the outset, the Court must address the Petitioner's claim that the Commissioner of Education improperly based his decision on issues that the School Committee failed to raise before or during the hearings in the instant matter. Specifically, Petitioner argues that the Commissioner's decision improperly relied on the Commissioner's determination that the working relationship between St. Pierre and Smithfield school administrators was "irreparably affected," as a result of the underlying incident, as one of the bases for his decision to sustain the School Committee's decision to terminate St. Pierre. (Commissioner's Decision at 10.)
The Court need not address this issue at length because the Commissioner's decision clearly relied on grounds in addition to St. Pierre's purportedly irreparable relationship with school district administrators. After first citing the damaged relationship between St. Pierre and district administrators as one of the bases for the decision to uphold the School Committee's decision to terminate, the Commissioner's *Page 14 
decision then states, "[f]or this reason [the damaged relationship]and because [the School Committee] demonstrated good and justcause, the decision of the Smithfield School Committee is sustained." Id. (emphasis added). Assuming without deciding that St. Pierre's relationship with school administrators was improperly relied upon by the Commissioner as one of the underpinnings of his decision, this Court will limit its analysis to those factual findings relied upon by both the School Committee and the Commissioner to support their determination that good and just cause to terminate St. Pierre existed.
The findings of fact outlined in the decisions issued by the School Committee and the Commissioner clearly establish that on September 11, 2006, Petitioner "positioned a stapler at or near a 10th grade student's head and pushed the stapler, ejecting the staple." (Decision of the Smithfield School Committee, 1.) Moments later, Petitioner and other students observed "blood running down the side of [the student's] face." Id. at 2. The findings of fact further establish that Petitioner "failed to require that the student report to the nurse for an examination or care," and, subsequently, Petitioner "failed to report the incident to either the Principal or the Superintendent of Schools." Id.
The actions for which St. Pierre was terminated — "the stapler trick" itself, St. Pierre's subsequent failure to send the student volunteer to the school nurse for an examination, and St. Pierre's failure to inform school administrators about the incident's occurrence — constitute "relevant evidence that a reasonable mind might accept as adequate to support a conclusion" that termination, rather than progressive discipline, was warranted in the case at bar. Wayne Distrib. Co., 673 A.2d at 459 (citingNewport Shipyard Inc., 484 A.2d at 896). Accordingly, applying the deferential standard of *Page 15 
review set forth in § 42-35-15(g), this Court is constrained to find that the decision to terminate the Petitioner's employment with the Smithfield School Department was sufficiently supported by the findings of evidentiary fact.
Furthermore, while the decisions issued by the Commissioner of Education and cited by Petitioner arose out of underlying facts more egregious than the circumstances surrounding the case at bar, the actions at issue therein cannot be considered the exclusive realm of "good and just cause" under the Act. Indeed, existing precedent with respect to teacher termination cases cannot possibly constitute an all-inclusive universe of actions amounting to "good and just cause" under the Act. See 78 C.J.S., Schools andSchool Districts, § 395 ("[T]he phrase ["good and just cause"] includes "any ground that is put forth by the school board in good faith and which is not arbitrary, irrational, unreasonable or irrelevant to the task of building and maintaining an efficient school system."); see also 68 Am.Jur.2d,Schools, § 231 ("The jurisdiction and discretion to determine what ["good and just"] causes may be rests in the hands of the school authorities.").
Counsel for the Petitioner concedes that the Petitioner made a mistake. The Court agrees, but further observes that the record demonstrates that St. Pierre made four mistakes: the trick itself, her failure to obtain medical attention for the student, her lack of candor in failing to report the incident to her principal, and the subsequent cover-up in which she solicited the aid of her students. In addition, regarding Petitioner's assertion that the School Committee must prove repetitive and/or intentional behavior, at minimum, to legally support termination of a tenured teacher, this Court finds that intentional actions demonstrating and compounding poor judgment in an isolated incident *Page 16 
can constitute "good and just cause" supporting termination under the Act. See Rogers, 749 A.2d at 1184 ("Whether termination is justifiable on the basis of a single incident is a qualitative, not quantitative analysis; one serious incident can suffice.").
The Court recognizes that the stapler incident occurred against the backdrop of an unblemished record. The Court further recognizes that the stapler incident was intended as a pedagogical aid in Petitioner's classroom; however, the Court cannot ignore the fact that the Petitioner's actions potentially compromised the well-being of the students placed in her care. Accordingly, the Court finds that the totality of the conduct and circumstances surrounding this incident as reflected in the record before the Appeals Committee demonstrates good and just cause for termination. Therefore, the decision of the Board of Regents is hereby affirmed.
 IV Conclusion
After a review of the entire record, the Court finds that the Board of Regents' affirmation of the decisions of the Commissioner and the School Committee, which found good and just cause to support termination of St. Pierre from her position as a teacher in the Smithfield School Department, was not in violation of its statutory authority, or clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record, or an abuse of discretion. Substantial rights of the Appellants have not been prejudiced. The Board of Regents' decision is therefore affirmed.
Counsel shall submit the appropriate judgment for entry.
[1] The Rhode Island Teachers' Tenure Act, G.L. 1956 § 16-13-1 et seq., provides, in pertinent part:
 Three (3) annual contracts within five (5) successive school years shall be considered evidence of satisfactory teaching and shall constitute a probationary period. Teachers who complete the probationary period shall be considered in continuous service and shall not be subject to annual renewal or nonrenewal of their contracts. Section 16-13-3(a).
[2] Also in attendance at the September 27th
meeting were Jane Argentieri, from the Rhode Island Chapter of the National Education Association ("NEARI"), Mike Twohey, President of the Smithfield Teachers Association, and Petitioner's husband.
[3] Hearings on the instant matter took place on February 26th, February 27th, March 14th, March 22nd, March 26th, March 27th, April 12th, April 26th, May 3rd, and June 27th of 2007.
[4] Sections 16-13-4 and 16-13-5 of the Act establish different procedural prescriptions that school administrators must employ when commencing certain disciplinary actions against teachers. The applicable procedure differs depending on whether a teacher dismissal or teacher suspension is at issue. Section 16-13-4(a), relating to dismissal of teachers, states, in pertinent part:
 The statement of cause for dismissal shall be given to the teacher, in writing, by the governing body of the schools at least one month prior to the close of the school year. The teacher may, within fifteen (15) days of the notification, request, in writing, a hearing before the full board. The hearing shall be public or private, in the discretion of the teacher. Both teacher and school board shall be entitled to be represented by counsel and to present witnesses. The board shall keep a complete record of the hearing and shall furnish the teacher with a copy. Any teacher aggrieved by the decision of the school board shall have the right of appeal to the department of elementary and secondary education and shall have the right of further appeal to the superior court. (Emphasis added.)
With respect to the suspension of teachers, § 16-13-5(a) provides:
 Section 16-13-4 shall not prevent the suspension of a teacher for good and just cause. Prior to the suspension of a teacher as provided in this section, the school committee shall hold a pre-suspension hearing to determine if a suspension is warranted, and at the pre-suspension hearing, shall consider any available evidence and afford the teacher or his or her counsel an opportunity to respond to that evidence. In the event a teacher is suspended or otherwise not permitted to perform his or her duties prior to the presuspension [sic] hearing, then the teacher shall be paid his or her regular salary during that period.
[5] Petitioner also cites a non-binding Superior Court case,Quattrucci v. R.I. Bd. of Regents for Elementary and SecondaryEducation, 2006 WL 1628824 (R.I. Super. 2006) as additional support for her progressive discipline argument. Therein, the Superior Court upheld the termination of a tenured teacher for good and just cause based, in part, on five years of unsatisfactory evaluations. However, the Court finds Petitioner's assertion that Quattrucci stands for the broad proposition that progressive discipline must always precede termination of a tenured teacher mischaracterizes the narrow holding in that case.Id. at 7-8.