## LAURA LANGELLO *v.* WEST HAVEN BOARD OF EDUCATION
## (AC 34206)

Alvord, Bear and Sheldon, Js.

Argued December 13, 2012—officially released April 30, 2013

*John R. Williams*, for the appellant (plaintiff).

*Warren L. Holcomb*, for the appellee (defendant).

*Opinion*

ALVORD, J. The plaintiff, Laura Langello, appeals from the judgment of the trial court affirming the decision of the defendant, the West Haven board of education (board), to terminate her employment contract. The plaintiff, a tenured teacher in the West Haven public

school district, claims that the court failed to give sufficient weight to General Statutes (Rev. to 2009) § 46a-60 (Fair Employment Practices Act)[1] when it affirmed the board's decision to terminate the plaintiff's employment contract on the grounds of "disability" and "other due and sufficient cause" as set forth in General Statutes § 10-151 (Teacher Tenure Act).[2] We disagree and, accordingly, affirm the judgment of the trial court.

The record reveals the following procedural history pursuant to § 10-151 (d).[3] By letter dated January 11,

[1] General Statutes (Rev. to 2009) § 46a-60 (a) provides in relevant part: "It shall be a discriminatory practice in violation of this section: (1) For an employer, by the employer or the employer's agent, except in the case of a bona fide occupational qualification or need, to refuse to hire or employ or to bar or to discharge from employment any individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment because of the individual's race, color, religious creed, age, sex, marital status, national origin, ancestry, present or past history of mental disability, mental retardation, learning disability or physical disability, including, but not limited to, blindness . . . ."

[2] We note that § 10-151 has been amended several times since 2010. See Public Acts 2010, No. 10-111, § 9; Public Acts 2011, No. 11-28, § 8; Public Acts 2011, No. 11-135, § 10; Public Acts 2011, No. 11-136, § 14; Public Acts 2012, No. 12-116, § 57. The amendments in Public Acts 2012, No. 12-116, will take effect on July 1, 2014. Because these amendments are not relevant to the claims raised by the plaintiff, we refer in this opinion to the current revision of § 10-151.

General Statutes § 10-151 (d) provides in relevant part: "The contract of employment of a teacher who has attained tenure shall be continued from school year to school year, except that it may be terminated at any time for one or more of the following reasons: (1) Inefficiency or incompetence . . . (2) insubordination against reasonable rules of the board of education; (3) moral misconduct; (4) *disability, as shown by competent medical evidence*; (5) elimination of the position to which the teacher was appointed or loss of a position to another teacher . . . or (6) *other due and sufficient cause*. . . ." (Emphasis added.)

[3] General Statutes § 10-151 (d) provides in relevant part: "Prior to terminating a contract, the superintendent shall give the teacher concerned a written notice that termination of such teacher's contract is under consideration and, upon written request filed by such teacher with the superintendent, within seven days after receipt of such notice, shall within the next succeeding seven days give such teacher a statement in writing of the reasons therefor. Within twenty days after receipt of written notice by the superintendent that contract termination is under consideration, such teacher may file

2010, Neil C. Cavallaro, the superintendent of schools for the town of West Haven, informed the plaintiff that termination of her employment contract with the West Haven public schools was under consideration. The letter informed her that further proceedings would occur in accordance with § 10-151. The plaintiff responded by letter dated January 15, 2010, seeking a statement of the reason why the board was considering terminating her employment contract. In a letter dated January 20, 2010, Cavallaro responded to the plaintiff by setting forth several reasons why the termination of her employment contract was being recommended pursuant to criteria set forth in § 10-151 (d), namely, inefficiency and/or incompetence, disability, and other due and sufficient cause. In a letter dated January 29, 2010, the plaintiff requested a hearing before a single impartial hearing officer chosen by the plaintiff and Cavallaro.

An impartial hearing officer, whom the parties selected, conducted a six day hearing concerning the termination of the plaintiff's employment contract on February 24, March 19, 26 and 31, and April 1 and 2, 2010. The hearing officer issued a decision on April

with the local or regional board of education a written request for a hearing. A board of education may designate a subcommittee of three or more board members to conduct hearings and submit written findings and recommendations to the board for final disposition in the case of teachers whose contracts are terminated. Such hearing shall commence within fifteen days after receipt of such request . . . if the parties mutually agree, before a single impartial hearing officer chosen by the teacher and the superintendent. . . . Within seventy-five days after receipt of the request for a hearing, the impartial hearing panel, subcommittee of the board or hearing officer, unless the parties mutually agree to an extension not to exceed fifteen days, shall submit written findings and a recommendation to the board of education as to the disposition of the charges against the teacher and shall send a copy of such findings and recommendation to the teacher. The board of education shall give the teacher concerned its written decision within fifteen days of receipt of the written recommendation of the impartial hearing panel, subcommittee or hearing officer. . . ."

28, 2010, recommending termination of the plaintiff's employment contract. In a letter dated May 4, 2010, Cavallaro informed the plaintiff that the board had adopted the findings of fact, conclusions and recommendations of the hearing officer and, accordingly, terminated the plaintiff's employment contract.

On May 21, 2010, the plaintiff filed a complaint with the Superior Court, pursuant to § 10-151 (e),[4] appealing from the board's decision to terminate her employment contract. In a hearing conducted before the court on September 21, 2011, the board indicated that it would be relying solely on "disability" and "other due and sufficient grounds" as the bases for the termination of the plaintiff's employment contract. (Internal quotation marks omitted.) The court dismissed the plaintiff's appeal in a memorandum of decision on December 27, 2011. This appeal followed.

The following facts, which were found by the hearing officer and adopted by the board, are relevant to this appeal. The plaintiff was a tenured elementary instrumental music teacher who was employed by the board. Throughout most of her career, the plaintiff has suffered

---

[4] General Statutes § 10-151 (e) provides: "Any teacher aggrieved by the decision of a board of education after a hearing as provided in subsection (d) of this section may appeal therefrom, within thirty days of such decision, to the Superior Court. Such appeal shall be made returnable to said court in the same manner as is prescribed for civil actions brought to said court. Any such appeal shall be a privileged case to be heard by the court as soon after the return day as is practicable. The board of education shall file with the court a copy of the complete transcript of the proceedings of the hearing and the minutes of board of education meetings relating to such termination, including the vote of the board on the termination, together with such other documents, or certified copies thereof, as shall constitute the record of the case. The court, upon such appeal, shall review the proceedings of such hearing. The court, upon such appeal and hearing thereon, may affirm or reverse the decision appealed from in accordance with subsection (j) of section 4-183. Costs shall not be allowed against the board of education unless it appears to the court that it acted with gross negligence or in bad faith or with malice in making the decision appealed from."

from numerous health conditions, including post-traumatic stress disorder, depression, anxiety and sleep and mood disorders. She also has a nonmalignant brain cyst and suffers from chronic allergies and a pulmonary condition. These medical conditions have caused the plaintiff to be hospitalized five or six times over the past five years, and she has planned to commit suicide on several occasions. The plaintiff also has been forced to take several leaves of absence from her employment due to her medical conditions, resulting in a rate of absenteeism that is substantially higher than the average rate for teachers statewide and in West Haven.[5]

In 1993, the plaintiff, who was employed as a West Haven schoolteacher, underwent a fitness for duty examination. The examination revealed that the plaintiff was not fit for duty because she appeared to be "confused," "overwhelmed" and to have "difficulty in performing even the simplest task around the house." (Internal quotation marks omitted.) In 1994, the plaintiff worked only twenty hours per week as a scheduling accommodation, and the next year a full-time paraprofessional was assigned to assist the plaintiff with the transition back to full-time employment. The accommodation of a full-time paraprofessional to assist the plaintiff continued until the termination of the plaintiff's employment contract more than fourteen years later. Throughout those fourteen years, the plaintiff divided her time between two different schools within the district. During that period, Cavallaro and the school principals under whom the plaintiff worked reported

[5] The record contains facts found by the hearing officer regarding the plaintiff's absenteeism over the course of a seventeen year period, which omits one year when the plaintiff was on administrative leave for the entire year and one year when data was unavailable. During those seventeen years, the plaintiff missed 667 days of work, an average of thirty-nine days per year. The hearing officer found that, "[a]ccording to records maintained by the Connecticut Department of Education, state-wide teachers average between 7.0 and 8.5 days of absence per year. The average in West Haven is slightly higher than the state average."

concerns that the plaintiff had a "glassy eyed stare," and looked "exhausted," "heavily medicated," "zombie-like," "slower than normal," "dazed and confused" and "unfocused if not disoriented." (Internal quotation marks omitted.) Some of these concerns arose as a result of observations made at a winter concert led by the plaintiff, during which she slurred her words, forgot the names of students, announced the incorrect titles to songs and temporarily forgot the name of the paraprofessional with whom she had worked closely for six years.

During the time between when the plaintiff began receiving assistance from a full-time paraprofessional and when the board decided to terminate the plaintiff's employment contract, there was a decrease in the number of students participating in the plaintiff's band class and an increase in the number of parents who complained about the plaintiff. The parents' complaints ranged from the inadequacy of her teaching ability to allegations by the students that she would fall asleep during class. In fact, the hearing officer found that there had been more complaints about the plaintiff than any other teacher in West Haven. Teachers and one of the school principals expressed concerns because the plaintiff would drop things, trip, aimlessly wander the hallways and forget to notify a substitute teacher when she was absent. Further, her attendance was erratic, and she frequently was tardy in arriving to teach her class.

Several specific instances of conduct also caused concern. In one instance, the plaintiff dismissed early the entire middle school band class, which consisted of approximately forty students, because she thought several students were misbehaving. The school nurse found the dismissed students wandering around the school crying and emotionally distraught. The school

principal thought the plaintiff's actions created a dangerous situation. In another instance, the principal, who was observing the plaintiff's class, stopped the plaintiff from dismissing class prematurely and had to inform her that twenty minutes remained in the period. In a third instance, the plaintiff was found sleeping in her car in the parking lot before school. In a fourth instance, the plaintiff drove to the wrong school and waited for an hour until the principal of that school asked her why she was there when she was scheduled to be at a different school one-half mile away. The plaintiff replied that she was running out of gas and had locked her keys in her car. The principal agreed to assist her, noticed that the rear door of her car was unlocked and retrieved the plaintiff's keys from inside the car. Concerned about the plaintiff's mental state, the principal directed her to wait for someone from the other school to come and pick her up. Instead, the plaintiff left in her car and arrived at the proper school one-half mile away twenty minutes later.

On May 7, 2009, approximately two weeks after the incident when the plaintiff drove to the wrong school and mistakenly thought she had locked her keys in her car, the plaintiff looked ill. The principal directed her to go home and not to return that evening for the spring concert. The plaintiff went home, but then attempted to return for the concert and was involved in a car accident. Due to the accident of May 7, 2009, and the instance that occurred two weeks prior, Cavallaro ordered the plaintiff to submit to a fitness for duty assessment. In addition to an assessment of her physical condition, the plaintiff was required to submit to a psychiatric fitness for duty assessment, which was performed by psychiatrist Remo Fabbri. In conducting his assessment, Fabbri spoke with the plaintiff, her psychiatrist, her personal psychotherapist and her general practitioner. Fabbri also arranged for the plaintiff to undergo

a neuropsychological exam with Armin Thies, a board certified clinical neuropsychologist.

Thies found that the plaintiff had a markedly deficient capacity to retrieve and store information and a depressed executive functioning, which manifested itself in marginally slower processing speed, loss of mental set and difficulty alternating between sequences.[6] Thies found that the plaintiff was mildly mentally deficient with regard to declarative memory and that she had particularly poor organizational skills. He also found that the plaintiff, despite her education level, scored in the lowest one percentile range in several tests: reading comprehension; maintaining mental set; organization; visual working memory; and auditing, visual, immediate and delayed memory. Thies concluded that the plaintiff had poor concentration, poor memory and difficulty managing routine affairs. The plaintiff's treating psychiatrist did not dispute Thies' findings; he opined that the plaintiff is disabled and that her conditions are not likely to improve.

Fabbri's assessment was that the plaintiff's psychiatric prognosis did not appear likely to improve. He noted the aggressive psychiatric regimen the plaintiff had been under and the extensive medical treatment she had received. Initially, he believed that the plaintiff would be able to return to work, but he concluded that she was not fit for duty, stating: "Therefore, in the best interests of all concerned, and after thinking and re-thinking this complicated situation, I would suggest that [the plaintiff], in view of her multiple medical disabilities and syndromes . . . be offered an early retirement package . . . ." The hearing officer recommended that the

---

[6] The hearing officer found: "Mental set is the ability to remember what you are supposed to be doing, understanding abstract concepts, monitoring behavior and self performance. . . . As Dr. Thies testified, executive function is responsible for regulating judgment and coordination of mental activities."

plaintiff's employment contract be terminated, and the board adopted that recommendation. This appeal followed.

Additional facts will be set forth as necessary.

I

In the board's brief to the trial court, it contended that "there is absolutely no jurisprudence to support [the] plaintiff's contention that the Teacher Tenure Act was intended to be read in conjunction with the [Americans with Disabilities Act (ADA) (42 U.S.C. § 12101 et seq.)] or the Connecticut Fair Employment Practices Act . . . ." At the September 21, 2011 hearing before the court, however, the board conceded that it was required to make reasonable accommodations to the plaintiff due to her physical and mental condition because such accommodation is required by the ADA.[7] On appeal, the board maintains the position it took at the September 21, 2011 hearing and further concedes that the Teacher Tenure Act must be read in conjunction with the Fair Employment Practices Act. The plaintiff's argument, which is identical to the argument she advanced at trial, does not contest that the board complied with its obligation to make a reasonable accommodation; the plaintiff concedes that the board did provide her with a reasonable accommodation. Rather, her argument is that the board improperly terminated her employment contract because she was able to perform the essential functions of her job with the assistance of the accommodation that the board provided.

[7] Title 42 of the United States Code, § 12112 (b), provides in relevant part: "[t]he term 'discriminate' includes . . . (5) (A) not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity . . . ."

Although both parties stipulate that the termination of a tenured teacher's employment pursuant to the Teacher Tenure Act is subject to the restrictions and procedures mandated by the Fair Employment Practices Act, the manner in which the two acts coexist is an issue of first impression for this court. Additionally, the interplay of the Teacher Tenure Act and the Fair Employment Practices Act is an essential predicate to addressing the plaintiff's claim on appeal. We are therefore compelled to conduct the following analysis.

"When . . . a statutory provision is silent with respect to [the issue at hand], our analysis is not limited by [General Statutes] § 1-2z, which provides that the meaning of statutes shall be ascertained from only their text and their relationship to other statutes if those sources reveal an unambiguous meaning that is not absurd or unworkable. . . . In addition to the words of the statute itself, we look to . . . the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Citation omitted; internal quotation marks omitted.) *Curry* v. *Goodman*, 286 Conn. 390, 407, 944 A.2d 925 (2008). "Furthermore, it is an elementary rule of statutory construction that we must read the legislative scheme as a whole in order to give effect to and harmonize all of the parts. . . . When statutes relate to the same subject matter, they must be read together and specific terms covering the given subject matter will prevail over general language of the same or another statute which might otherwise prove controlling." (Citation omitted; internal quotation marks omitted.) *Coregis Ins. Co.* v. *Fleet National Bank*, 68 Conn. App. 716, 720, 793 A.2d 254 (2002).

"It is axiomatic that Connecticut adheres to a public policy prohibiting discrimination on the basis of disabilities. Such a policy is embodied in General Statutes

§ 46a-60 (a) (1), which prohibits discrimination because of [an] individual's . . . present or past history of mental disability . . . or physical disability . . . ." (Internal quotation marks omitted.) *International Brotherhood of Police Officers, Local 361* v. *New Milford*, 81 Conn. App. 726, 735, 841 A.2d 706 (2004). Our Supreme Court has stated that "[t]he legislative history of the [fair employment practices] act indicates that the statute was intended to provide strong protections for those with disabilities"; *Curry* v. *Goodman*, supra, 286 Conn. 410–11; and that a "thorough review of the legislative history reveals a consistent intent to increase protections for individuals with disabilities." Id., 412. Because "the intent of the legislature [was] to stamp out discrimination on the basis of physical disability and a wide range of other disabilities (mental disability, learning disability and [intellectual disability]), we must not interpret the statute in a way that would thwart this purpose." Id.

Our Supreme Court "has determined that Connecticut antidiscrimination statutes should be interpreted in accordance with federal antidiscrimination laws." Id., 407. While certain elements of the Fair Employment Practices Act and the ADA differ,[8] "[c]laims for violations of the [Fair Employment Practices Act] are analyzed under the same standards as claims for violations of the ADA." *Chasse* v. *Computer Sciences Corp.*, 453 F. Sup. 2d 503, 514 n.4 (D. Conn. 2006). "[D]iscrimination on [the] basis of [a] disability under [the] ADA includes not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant

---

[8] See, e.g., *Beason* v. *United Technologies Corp.*, 337 F.3d 271, 276–79 (2d Cir. 2003) (concluding that ADA requires that disability substantially limits one or more of individual's major life activities, whereas Fair Employment Practices Act has no such requirement); id., 279–82 (explaining that Fair Employment Practices Act does not recognize perceived disability, whereas ADA does). Neither of the distinctions raised in *Beason* affect this case.

or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." (Internal quotation marks omitted.) *Curry v. Goodman,* supra, 286 Conn. 408. "Under the ADA, a qualified individual with a disability is one who is capable of performing the essential functions of the desired job with or without reasonable accommodation." Id., 402 n.8. In *Curry,* the court concluded that the legislative intent with regard to the Fair Employment Practices Act requires "employers to make a reasonable accommodation for an employee's disability," despite no such language in the statute's text. See id., 415.

In keeping with the public policy that prohibits discrimination on the basis of disability, and our Supreme Court's analysis of the legislative intent behind § 46a-60 (a) (1), we conclude that any teacher who is terminated pursuant to the Tenure Teacher Act enjoys the protections of the Fair Employment Practices Act. A contrary conclusion—that a tenured teacher who is discharged from her employment because of her disability pursuant to § 10-151 (d) (4) is outside of the protections of § 46a-60—would thwart the purpose of the Fair Employment Practices Act. To ensure compliance with the purpose of the Fair Employment Practices Act, a teacher who is discharged for any of the reasons enumerated in § 10-151 (d) must be afforded the protections of § 46a-60. A board of education, if it seeks to terminate a teacher's employment pursuant to the Teacher Tenure Act for reason of a disability, must follow the mandates of the Fair Employment Practices Act and show that the teacher was unable to perform the essential functions of her profession with or without reasonable accommodation.

## II

Having determined that the board was required to prove that the plaintiff was unable to perform the essential functions of her profession with or without reason-

able accommodation,[9] we turn to the issue of whether the board provided the requisite proof in this case. As both grounds on which the Superior Court affirmed the board's decision to terminate the employment of the plaintiff are subject to compliance with the Fair Employment Practices Act, the question of whether the plaintiff could perform the essential functions of an elementary level instructional music teacher with the assistance of a full-time paraprofessional is dispositive to this appeal.

The following additional facts, which were found by the hearing officer, are relevant to the issue of whether the plaintiff could perform the essential functions of her job with the accommodation of a full-time parapro-fessional. The plaintiff received the accommodation of working with a full-time paraprofessional from 1995 until the time of the termination of her employment contract. Misty Talamelli, who is not a certified teacher, served as the full-time paraprofessional assigned to assist the plaintiff from December, 2000 through June, 2009. In her role of assisting the plaintiff, Talamelli performed the following duties: scheduled students' rehearsal times; arranged concerts; arranged field trips;

---

[9] The parties do not contest whether the hearing officer in this case utilized the proper framework for determining whether a prima facie claim of discrimination under the Fair Employment Practices Act was established. Thus, we do not have reason to decide whether this claim, that employment termination pursuant to § 10-151 (d) violated § 46a-60, should have been brought under the mixed motive/*Price Waterhouse* framework; *Price Water-house* v. *Hopkins*, 490 U.S. 228, 246, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989); or the pretext/*McDonnell Douglas-Burdine* framework; *Texas Dept. of Com-munity Affairs* v. *Burdine*, 450 U.S. 248, 252–56, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981); *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973); or, further, whether each of the enumerated reasons for termination pursuant to § 10-151 (d) would be brought within the same framework. See *Levy* v. *Commission on Human Rights & Opportu-nities*, 236 Conn. 96, 104–109, 671 A.2d 349 (1996); *Tomick* v. *United Parcel Service, Inc.*, 135 Conn. App. 589, 610–12, 43 A.3d 722, cert. denied, 305 Conn. 920, 47 A.3d 389 (2012). We therefore review the plaintiff's claim as though the proper burdens of production and persuasion were followed.

collected money; graded work sheets; entered grades into the computer; calculated the students' final grade; and, periodically, determined the grade a student should receive and taught the class when the plaintiff was absent.

The hearing officer found that the duties of an instrumental music teacher at the elementary level include compiling the music that students will use, working with the instrument company to secure instruments for the students, arranging the students' schedule with other teachers, providing instrument instruction, preparing for concerts, recruiting students to band, preparing lesson plans and grading students' work. The record also contains a list of the "Essential Duties and Responsibilities" for a "Teacher, Instrumental Music (Elementary)." Essential duties from this list were referenced in Fabbri's assessment, which stated that the neuropsychological testing of the plaintiff indicated that four specific essential duties would present a challenge to her: (1) "[e]stablishes and maintains standards of student behavior required to provide an orderly and productive environment"; (2) "[d]evelops instructional plan and organizes class time to provide a balanced program of instruction, demonstration and working time"; (3) "[g]ives clear directions and makes sure students understand what to do before undertaking assignments"; and (4) "[c]onducts interesting and well-paced classes using a variety of instructional techniques and materials appropriate to the lessons." (Internal quotation marks omitted.) The hearing officer credited the conclusion of Fabbri's assessment in her determination.[10]

The hearing officer also credited Thies, who stated that declarative memory is the type of memory most

---

[10] The hearing officer noted that the plaintiff's personal psychiatrist believes that the plaintiff can perform these essential duties with the accommodation that the board has provided.

often relied on in school, occupations and daily functioning. Thies characterized the plaintiff's declarative memory as "particularly poor." (Internal quotation marks omitted.) He further testified that the plaintiff would have "great difficulty learning novel material," and opined that this would be problematic in a field that required continuous learning and professional development. (Internal quotation marks omitted.) Cavallaro echoed Thies' opinion, stating that teachers regularly are expected to learn new material and methods for delivering instruction. Thies also predicted that the plaintiff would need to interrupt her work periodically because of the likelihood of necessary psychiatric hospitalization in the future.

The hearing officer found that the plaintiff failed to perform some of the most basic duties of an instrumental music teacher, such as recruiting students to participate in band and communicating with parents. Additionally, the school principals expressed concern about the plaintiff's ability to perform the essential functions of her job, with one estimating that the full-time paraprofessional, Talamelli, performed approximately 90 percent of the classroom teacher's duties. One instance that supports that concern occurred when a principal of one of the schools requested to examine the plaintiff's lesson plans. In response to that request, the plaintiff provided him with a single sheet of paper spanning a six week time period. She also submitted a calendar with handwritten notes about the students' activities. The principal stated that those documents did not meet the requirement that all teachers must maintain lesson plans. Further, Talamelli testified that she had prepared the lesson plans that the plaintiff submitted in response to the principal's request. Cavallaro and the principal testified that it is a violation of state certification law for someone other than a certified teacher to prepare lesson plans.

The hearing officer determined that the evidence of the plaintiff's mental disability established cause for the termination of her employment contract pursuant to § 10-151. The plaintiff's poor attendance, inability to provide proper instruction to her students, failure to make lesson plans, errors in judgment and troubling actions on several specific occasions supported the hearing officer's determination that the board had ample justification to terminate the plaintiff's employment contract for other due and sufficient cause.[11] See General Statutes § 10-151 (d) (6). Further, competent medical evidence about the plaintiff's disability and the essential functions of an elementary instrumental music teacher led the hearing officer to conclude that "[the plaintiff's] disabilities are interfering with her performance as a teacher [and] that she is unable to perform the essential functions of her position." This determination was based on the opinion of a psychiatrist who "identified a number of the essential components of the teacher job description which he believed [the plaintiff] would experience difficulty performing." Ultimately, the hearing officer concluded that "[t]he evidence in this record establishes that the [plaintiff] is disabled and that her disabilities have made her unable to perform the essential functions of her teaching position even with the accommodation of a full-time paraprofessional assistant." The hearing officer therefore concluded that the board was justified in terminating the plaintiff's employment contract due to her disability. See General Statutes § 10-151 (d) (4).

"Judicial review of the school board's administrative decision follows established principles of administrative law. The court's ultimate duty is only to decide whether, in light the evidence, the [board] has acted

---

[11] These reasons also led the hearing officer to conclude that the board had ample justification to terminate the plaintiff's employment contract for inefficiency or incompetence. See General Statutes § 10-151 (d) (1). As previously noted, on appeal to the Superior Court, the board chose not to pursue its claim that the plaintiff was inefficient or incompetent.

unreasonably, arbitrarily, illegally, or in abuse of its discretion. . . . Conclusions of law reached by the [board] must stand if the court determines that they resulted from a correct application of the law to the facts found and could reasonably and logically flow from such facts." (Internal quotation marks omitted.) *Rogers* v. *Board of Education*, 252 Conn. 753, 761, 749 A.2d 1173 (2000). "Judicial review of [a board's] decision requires a court to determine whether there is substantial evidence in the administrative record to support the [board's] findings of basic fact and whether the conclusions drawn from those facts are reasonable." (Internal quotation marks omitted.) Id., 768.

The Teacher Tenure Act provides that a court reviewing an appeal from the decision of a hearing officer "may affirm or reverse the decision appealed from in accordance with subsection (j) of section 4-183 . . . ." General Statutes § 10-151 (e). "The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court shall affirm the decision of the agency unless the court finds that substantial rights of the person appealing have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: (1) In violation of constitutional or statutory provisions; (2) in excess of the statutory authority of the agency; (3) made upon unlawful procedure; (4) affected by other error of law; (5) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or (6) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion. . . ." General Statutes § 4-183 (j).[12]

---

[12] We note that § 4-183 (j) is within the Uniform Administrative Procedure Act (UAPA). See General Statutes § 4-166 et seq. Generally, "a board of education considering termination of a tenured teacher's employment contract acts in a quasi-judicial capacity . . . a board of education is not an administrative agency as defined by the Uniform Administrative Procedure Act (UAPA) . . . and is not subject to the provisions of the UAPA." (Cita-

The plaintiff contends that the decision to terminate her employment contract pursuant to § 10-151 (d) violated the statutory principles set forth in the Fair Employment Practices Act. The board's decision to discharge the plaintiff pursuant to the Teacher Tenure Act complied with the mandates of the Fair Employment Practices Act. The board provided the plaintiff with a reasonable accommodation, and only sought termination of her employment once it determined she was unable to perform the essential functions of her job with that accommodation. The hearing officer considered the totality of the evidence and the specific facts of this case and concluded that the board properly could terminate the plaintiff's employment contract because she was unable to perform the essential functions of her job with the accommodation of a full-time paraprofessional.[13] The trial court properly affirmed the board's decision.

The judgment is affirmed.

In this opinion the other judges concurred.

---

tions omitted.) *Rogers* v. *Board of Education*, supra, 252 Conn. 763–64. Although the board is not subject to every provision within the UAPA, § 10-151 (e) specifically prescribes that termination pursuant to § 10-151 (d) must conform with § 4-183 (j).

[13] The plaintiff argues that "[t]he problem for the [board] in this case is that neither the lower court nor the [b]oard itself even addressed the issue of what constitute[s] the 'essential functions' of an elementary school band teacher." The plaintiff cites *Borkowski* v. *Valley Central School District*, 63 F.3d 131 (2d Cir. 1995), for the proposition that the board must produce sufficient evidence that a paraprofessional was unable to aid a teacher sufficiently in achieving the essential functions of her position. Id., 140–42. A review of the record reveals that the board did produce the requisite evidence in this case. Further, *Borkowski* vacated sufficiently the rendering of summary judgment for the board of education. Id., 134. It is axiomatic that the standard of review an appellate court affords a judgment rendered after a complete opportunity to litigate the issues differs from the review an appellate court affords a summary judgment.